UNITED STATES of America, Plaintiff-Appellee,

v.

Frederick Joseph TURK, Defendant-Appellant.

No. 74–3626.

United States Court of Appeals, Fifth Circuit.

Jan. 29, 1976. Rehearing and Rehearing En Banc Denied March 8, 1976.

George D. Gold, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Ted Greenberg, Washington, D. C., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

Frederick Joseph Turk was convicted of committing perjury in his testim y before a federal grand jury. Most f the issues in this appeal relate to the manner in which law enforcement officials became privy to a telephone conversation between Turk and an acquaintance. Although our analysis of these issues differs from that of the trial court, our conclusions are to the same effect—Turk is entitled to no relief on his claims that the Government has abridged his statutory and fourth amendment rights. We are also unpersuaded by Turk's other arguments, and thus we affirm the conviction.

## I. THE FACTS

On July 13, 1973, officers of the Dade County Public Safety Department received a tip that two individuals would soon leave a specified Miami residence in a silver sports car containing cocaine and firearms. The officers stopped the car, discovered these illicit contents, and arrested the two individuals, Charles Kabbaby and Glenn Roblin. At that time the officers removed from the car, among other objects, a box containing a cassette tape recorder-player and two cassette tapes. Kabbaby told them that "nothing" was on the tapes. The officers then proceeded to play the tapes at the stationhouse, without Kabbaby's permission and without attempting to obtain a warrant. They soon realized that they were listening, on one of the tapes, to a recording of a private telephone conversation between Kabbaby and

someone called "Freddy." The officers continued to listen out of "curiosity."

In the course of the recorded conversation, Freddy mentioned his telephone number, which the authorities were able to use to locate him. Freddy was, of course, Frederick Turk, the appellant. Turk was then subpoenaed to appear before a federal grand jury that was investigating possible violations of federal narcotics laws. He initially invoked his fifth amendment privilege not to testify. After he was granted immunity from prosecution pursuant to 18 U.S.C. § 6001, he returned to testify before the grand jury on November 27 and December 11 of 1973. During Turk's testimony, the following colloquy, and others like it, took place between government counsel (Q.) and Turk (A.):

> Q. Let me ask you one final question, Mr. Turk. Have you ever at anytime been engaged in buying, selling, or otherwise trafficking in marijuana or any other narcotic substance?
>
> A. No, sir.

Turk was subsequently indicted on two counts of making "irreconcilably contradictory statements" and two counts of obstruction of justice. A superseding indictment, dated July 10, 1974, added two counts of perjury. In a jury trial in September, 1974, Turk was found guilty on one count of perjury, for having denied any involvement in marijuana trafficking. Over Turk's objections and motions to suppress, the tape seized from Kabbaby's car was played both at the grand jury before which he is alleged to have perjured himself, and at his perjury trial. The Government's other evidence at the trial consisted primarily of the testimony of Glenn Roblin and two other individuals who purported to have some personal knowledge relating to Turk's involvement in the importation of marijuana.

## II. THE SEARCH

### A. *The Omnibus Act.*

Title III of the 1968 "Omnibus Crime Control and Safe Streets Act," codified at 18 U.S.C. §§ 2510–2520, proscribes generally the interception or disclosure of wire or oral communications, and provides a procedure through which law enforcement officials can be authorized to intercept such communications in certain limited circumstances. Turk argues that the action of the officers in listening to the cassette tape seized from Kabbaby's car constituted an impermissible "interception" of Turk's oral communication, as defined in 18 U.S.C. § 2510(4). If this argument is valid, then the introduction of the tape into evidence at the grand jury proceeding and at Turk's trial might have been barred by 18 U.S.C. § 2515, a statutory exclusionary rule.

§ 2510(4) provides:

> "intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

Kabbaby's action in recording his conversation with Turk was clearly an interception under this definition. This interception was not violative of the Act, however, because § 2511(2)(d) specifically exempts situations in which one party to the conversation is himself the interceptor.[1]

Whether the seizure and replaying of the cassette tape by the officers was also an "interception" depends on the definition to be given "aural acquisition." Under one conceivable reading, an "aural acquisition" could be said to occur whenever someone physically hears the contents of a communication, and thus the use of the tape player by the officers to hear the previously recorded conversa-

---

1. *See Smith v. Cincinnati Post & Times-Star*, 6 Cir. 1973, 475 F.2d 740; *Smith v. Wunker*, S.D.Ohio 1972, 356 F.Supp. 44. The party exemption is inapplicable only if the interception is "for the purpose of committing any criminal or tortious act." The exemption applies, then, even if the purpose of the conversation is criminal, as long as the purpose of the recording is not.

tion might fall within the definition set out above. No explicit limitation of coverage to contemporaneous "acquisitions" appears in the Act.

We believe that a different interpretation—one which would exclude from the definition of "intercept" the replaying of a previously recorded conversation—has a much firmer basis in the language of § 2510(4) and in logic, and corresponds more closely to the policies reflected in the legislative history. The words "acquisition . . . through the use of any . . . device" suggest that the central concern is with the activity engaged in at the time of the oral communication which causes such communication to be overheard by uninvited listeners. If a person secrets a recorder in a room and thereby records a conversation between two others, an "acquisition" occurs at the time the recording is made. This acquisition itself might be said to be "aural" because the contents of the conversation are preserved in a form which permits the later aural disclosure of the contents.[2] Alternatively, a court facing the issue might conclude that an "aural acquisition" is accomplished only when two steps are completed—the initial acquisition by the device and the hearing of the communication by the person or persons responsible for the recording.[3] Either of these definitions would require participation by the one charged with an "interception" in the contemporaneous acquisition of the communication through the use of the device. The argument that a new and different "aural acquisition" occurs each time a recording of an oral communication is replayed is unpersuasive. That would mean that innumerable "interceptions," and thus violations of the Act, could follow from a single recording.[4]

Another provision of the Act lends support to the view that "interception" should not be read to include the derivative acquisition at issue here. § 2511(1)(c) makes unlawfully the disclosure of the contents of wire or oral communications which have been illegally intercepted. At least one sort of derivative acquisition, then, is not an "interception"—if the acquisition through disclosure from a primary interceptor were meant to be a new "interception," Congress in its wisdom presumably would not have added a separate section providing a redundant sanction.[5]

Appellant concedes that he reads the definition sections of the Act "rather broadly," but argues that such a reading is buttressed by the legislative history. We disagree. While Congress clearly was concerned with the protection of individual's privacy interests against unjustified intrusions, it did not

---

**2.** In a forest devoid of living listeners, a tree falls. Is there a sound? The answer is yes, if an active tape recorder is present, and the sound might be thought of as "aurally acquired" at (almost) the instant the action causing it occurred. For § 2510(4) purposes, the recorder can be the agent of the ear.

**3.** In the typical case of wiretapping or electronic surveillance, these two steps would probably occur simultaneously. If, however, the recording is made, but is destroyed before anyone can hear it, whether there has been an "aural acquisition" is a nice question. Since the Act provides for civil damages, 18 U.S.C. § 2520, in addition to the statutory exclusionary rule, 18 U.S.C. § 2515, the question could be significant. We need not reach it here, of course, since we conclude that an "interception" requires, at the least, involvement in the initial use of the device contemporaneous with the communication to transmit or preserve the communication.

**4.** Also, for a replaying to be an "acquisition," the listener would have to preserve the contents in her memory. Further, one already familiar with the contents presumably could not "acquire" them again. Absent express language so indicating, we find it very difficult to believe that Congress intended the applicability of Title III to turn on such fortuities.

**5.** The facts in this case reveal no "disclosure" by Kabbaby and, in any event, Kabbaby's interception was not illegal under Title III. § 2511(1)(c) is noted here only to demonstrate that the § 2510(4) definition of "intercept" should not be read to include every situation in which a person "aurally acquires" (read: "hears") the contents of a communication through the use of a device.

attempt through Title III to deal with all such intrusions. The specific focus of Title III is reflected in the many references in the legislative history to the problem being dealt with as "wiretapping and electronic surveillance." *See* 2 *U.S.Code, Cong. & Admin.News,* pp. 2153–63, 2177–97 *passim* (90th Cong., 2d.Sess.1968). The Senate Report, in explicating § 2510, contains the following:

> Paragraph (4) defines "intercept" to include the aural *acquisition* of the contents of any wire or oral communication *by* any electronic, mechanical, or other *device. Other forms of surveillance* are not within the proposed legislation.

*Id.* at 2178 (emphasis added). This passage indicates that the act of surveillance and not the literal "aural acquisition" (*i. e.,* the hearing), which might be contemporaneous with the surveillance, or might follow therefrom, was at the center of congressional concern. "Aural acquisition" seems to have been used by the Congress neither as a term of art nor as a term of technology. Whatever the precise temporal parameters under Title III of an "aural acquisition" (and thus of an interception), we conclude that no new and distinct interception occurs when the contents of a communication are revealed through the replaying of a previous recording.

## B. *The Fourth Amendment.*

Turk argues that whatever the relation of the Omnibus Act to this unusual situation, his conviction was tainted independently through the violation by the officers of his fourth amendment rights. The assertion is that the manner in which the police played and listened to the cassette tape constituted an illegal search and seizure. For Turk's conviction to be reversed on this ground, we would need to come to the following conclusions: that Turk had "standing" to raise this claim; that there was in fact an illegal search and seizure; and the introduction of the illegally seized evidence (and other evidence developed from it) at Turk's perjury trial was error; and that such error was not harmless.

### 1. *Standing.*

In this fourth amendment context, the requirement of "standing" means that only a "person aggrieved" by an unlawful search can invoke the rule that no evidence uncovered by such a search may be admitted in a criminal prosecution. The trial court expressly stated that the "sole basis" for its denial of Turk's motion to suppress the tape was that Turk lacked standing. Whether a party to a conversation recorded by the second party has standing to complain that police illegally seized the recording from the second party is a new and intriguing question. We would not be compelled to reach the merits of the search and seizure issue if we were able simply to agree with the district court's conclusion on standing, and so I feel that it is appropriate to indicate the analysis which leads me to a different conclusion.[6]

---

**6.** As evidenced by their concurring opinion, my Brothers believe that the threshold question of whether Turk had standing to contest the search need not be answered. Our disagreement over whether the standing issue should be pretermitted does not turn on any substantive considerations but rather reflects slightly differing views of the norms of judicial prudence. Pretermission of issues is clearly appropriate in many instances—as a general rule of prudence, a court should reach the minimum number of issues necessary to decide the case before it. Consideration of the issue of jurisdiction, however, can never be elided. In my view, the question of standing to contest a search is similar, for purposes of determining the propriety of pretermission, to the question of jurisdiction. As with the general question of standing to sue, *see* note 7, *infra,* the question of standing to contest a search is one which asks whether an issue is justiciable. It seems to me a sound jurisprudential principle that before an issue is decided, a court should first decide that the issue is justiciable.

I cannot agree, then, that the proper technique for review in a situation such as this is to decide, as a first question, whether the evidence is suppressible, and to decide, as a second question, whether the first question is

The analytical basis of the doctrine of standing for motions to suppress cannot be found in "case or controversy" principles.[7] Rather, one must look to the policies underlying the exclusionary rule itself in seeking to understand this limitation on its invocation. The Supreme Court has recently stated:

The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim . . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures . . . . In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect,

rather than a personal constitutional right of the party aggrieved.

*United States v. Calandra,* 1974, 414 U.S. 338, 347–48, 94 S.Ct. 613, 619, 38 L.Ed.2d 561.[8]

The Court has often noted another function served by the rule—"the imperative of judicial integrity."[9] As stated in *Terry v. Ohio,* 1968, 392 U.S. 1, 12–13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889:

Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions.

This second rationale for the rule has been criticized.[10] and recent Supreme

---

properly before the court only if the answer to the first question is yes. I think that it is particularly appropriate to indicate why we conclude that the party had standing when the district court expressly made the party's lack of standing the basis of its disposition of the issue. *See Diggs v. Shultz,* 1972, 152 U.S.App. D.C. 313, 470 F.2d 461, *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390. (McGowan, J.), in which the district court had dismissed for lack of standing to sue. The Court of Appeals discussed the standing question and concluded that plaintiffs did have standing, but affirmed the dismissal on the ground that the claim was not one in respect of which relief could be granted.

Unlike the ancient conundrum of chicken and egg, I feel that the issues before us here present themselves in a discernable order to which we should adhere—I believe substantive issues should not be cracked unless we first determine that the parties are postured to strike at them. In the circumstances of this case, my colleagues do not agree, so my discussion of standing should be read as a concurring opinion, and the remainder of the fourth amendment discussion should be read as if prefaced by, "Assuming, *arguendo,* that Turk had standing. . . ."

7. *See United States v. Hunt,* 5 Cir. 1974, 505 F.2d 931. The general requirement that a litigant demonstrate standing in order to be permitted to pursue a lawsuit is based on the concern that unless the claimant alleges a specific, unique injury resulting from the wrong, a court cannot be assured that a concrete "case or controversy" is presented, and the court may be unable to tailor relief closely to well defined claims. *See Korioth v. Briscoe,* 5 Cir.

1975, 523 F.2d 1271. In contrast, there is little doubt that a defendant seeking to have evidence against him suppressed will eagerly pursue the issue of the legality of the search, and no problems of unspecific or overbroad requests for relief inhere in such a motion.

8. *Calandra* quoted with approval the following language from *Elkins v. United States,* 1960, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669:

The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

*See also Mapp v. Ohio,* 1961, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

9. *Elkins v. United States, supra* note 8, 364 U.S. at 222, 80 S.Ct. 1437. *See also, e. g. Mapp v. Ohio, supra* note 8, 367 U.S. at 660, 81 S.Ct. 1684; *Linkletter v. Walter,* 1965, 381 U.S. 618, 637–38, 85 S.Ct. 1731, 14 L.Ed.2d 601.

10. The "judicial integrity" rationale has been criticized on the ground that popular perception might see judicial integrity as better served by convicting dangerous criminals, than by freeing them because of trivial police errors. *See* Kaplan, *The Limits of the Exclusionary Rule,* 26 Stan.L.Rev. 1027, 1036 n. 53. It has also been suggested that this rationale is inconsistent with principles of separation of power, with the requirement that defendant object to the introduction of the evidence, and with other limitations on the application of the rule. *See* Monaghan, *The Supreme Court, 1974 Term-Foreward: Constitutional Common Law,* 89 Harv.L.Rev. 1, 5 & n. 33 (1975).

Court opinions have left its exact status unclear.[11]

The exclusionary rule, as an attempt to promote these objectives, is in direct conflict with another important social policy—"it is desirable that criminals should be detected, and to that end that all available evidence should be used." *Olmstead v. United States*, 1928, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (Holmes, J., dissenting). The chief objection to the exclusionary rule, and the chief impediment to the expansion of its application, has been the concern that too often "[t]he criminal is to go free because the constable has blundered." *People v. Defore*, 1926, 242 N.Y. 13, 21, 150 N.E. 585, 587 (Cardozo, J.).

The Court's interest in the goal of convicting those guilty of breaking laws has led it to refuse to extend the exclusionary rule to every situation in which the suppression of evidence might act to deter future illegal conduct by officials.[12] For example, illegally seized evidence is admissible before grand juries,[13] and to impeach a defendant who has testified in his own behalf.[14] Also, the doctrine of "attenuation" permits the introduction of evidence which bears only a very indirect relation to the illegal search.[15]

"Standing" is now to be perceived, it seems, as another of these limitations on the exclusionary rule which result from balancing the competing goals.[16] This balance does not in itself, however, explain why the line limiting the number of individuals who may move successfully for suppression is drawn through the concept of standing. If the purpose of the exclusionary rule is only to protect uninvolved persons against future illegal searches (by removing incentives police might have for conducting such searches), and the competing consideration is simply a feeling that not every

---

**11.** *United States v. Peltier*, 1975, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374, dealt with the judicial integrity rationale in this manner (citations omitted):

> Decisions of this Court applying the exclusionary rule to unconstitutionally seized evidence have referred to "the imperative of judicial integrity," . . ., although the Court has relied principally upon the deterrent purpose served by the exclusionary rule. . . .

The majority opinion went on to conclude that, in the context of a good faith search by officials which is of questionable legality because of a subsequent refinement of search and seizure law, the correct approach to judicial integrity rationale

> does not differ markedly from the analysis the Court has utilized in determining whether the deterrence rationale undergirding the exclusionary rule would be furthered by retroactive application of new constitutional doctrines.

*Id.* at 538, 95 S.Ct. at 2318. *See Brown v. Illinois*, 1975, 422 U.S. 590, 607, 609–12, 95 S.Ct. 2254, 2263, 2265–66, 45 L.Ed.2d 416, 428, 431–32 (Powell, J., concurring in part) (In cases in which official conduct is flagrantly abusive of fourth amendment rights, "the deterrent value of the exclusionary rule is most likely to be effective, and the corresponding mandate to preserve judicial integrity, . . . most clearly demands that the fruits of official misconduct be denied.")

The imperative of judicial integrity is nowhere mentioned in the majority opinion in *Calandra,* despite vigorous arguments by the dissent that this rationale dictated an opposite result in the case. 414 U.S. at 355–67, 94 S.Ct. 613. The majority opinion in *Michigan v. Tucker,* 1974, 417 U.S. 433, 450 n. 25, 94 S.Ct. 2357, 2367, 41 L.Ed.2d 182, a fifth amendment case discussing the policies of the fourth amendment exclusionary rule, stated that the judicial integrity rationale

> is really an assimilation of the more specific rationales discussed in the text of this opinion, and does not in their absence provide an independent basis for excluding challenged evidence.

**12.** *See United States v. Calandra, supra,* 414 U.S. at 350–51, 94 S.Ct. 613.

**13.** *Id.*

**14.** *Walder v. United States*, 1954, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503. *Cf. Harris v. New York*, 1971, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (similar rule in respect to statements obtained from defendant without *Miranda* warnings).

**15.** *Wong Sun v. United States*, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *Nardone v. United States*, 1939, 308 U.S. 338, 341, 80 S.Ct. 266, 84 L.Ed. 307.

**16.** *See United States v. Calandra, supra,* 414 U.S. at 348, 94 S.Ct. 613 (dicta); *Alderman v. United States*, 1969, 394 U.S. 165, 174–75, 89 S.Ct. 961, 22 L.Ed.2d 176.

criminal should go free because the evidence against him was illegally obtained, then the balance might as well be struck by admitting the evidence from one out of every four or five illegal searches, on a random basis.[17]

Justice Powell, discussing the standing limitation as analogical support for the suppression of the exclusionary rule in grand jury proceedings, suggests the following:

> This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search.

*United States v. Calandra*, 414 U.S. at 348, 94 S.Ct. at 620. This explanation is persuasive in situations where the police, seeking evidence against X, have illegally searched the house of X and discovered unexpected evidence incriminating Y. Assuming the goal of the conviction of lawbreakers dictates that only one of the two can have evidence from the search suppressed, the future security of Z's house is better protected by giving that benefit to X.[18] The problem, however, is that the present standing requirement defines "victim of the search" in such a way that the object of the search of X's house might be the evidence against Y, and X, not Y, would still be the only "victim."[19] A tip that further evidence incriminating Y might be found in the house of Z would not, presumably, send the gendarmes scurrying for a warrant.[20]

This apparent incongruity between the line drawn by "standing" and the line which might achieve the optimum balance between pure deterrence of police illegality and conviction of as many criminals as possible suggests that something is at work here beyond the "prime purpose" of the exclusionary rule, *i. e.*, deterrence. To whatever extent the "judicial integrity" rationale of the exclusionary rule has survived as a separate analytical factor, it offers some explanation.[21] If it is generally offensive for courts to review evidence seized in violation of fourth amendment rights, it is even more offensive when the prosecu-

**17.** The illogical nature of the standing requirement as a means of balancing the policies for and against the exclusionary rule has been noted frequently. *See, e. g., United States v. Hunt*, 5 Cir. 1974, 505 F.2d 931; Kaplan, *supra* note 136, at 1048; Note, *Standing to Assert Constitutional Ius Tertii*, 88 Harv.L.Rev. 423, 442 n. 95 (1974); *The Supreme Court, 1968 Term*, 83 Harv.L.Rev. 62, 167–73 (1969).

**18.** This hypothetical further assumes that Z, and not Y, would be the target of the investigation which would lead the police to desire entry into Z's house.

**19.** In his opinion in *Alderman*, concurring in part and dissenting in part, Justice Fortas urged the adoption of a rule whereby a person would have "standing" if the authorities had conducted their unlawful search with the purpose of obtaining evidence to use against that person. 394 U.S. at 200–09, 89 S.Ct. 961. The majority refused to adopt such a rule. Justice Harlan, also concurring in part and dissenting in part, suggested that Justice Fortas' rule was ill-advised, chiefly because it would entail substantial administrative difficulties in the attempt to determine exactly against whom an investigation was directed. *See id.* at 188 n. 1, 89 S.Ct. 961.

If Y could show a proprietary interest in the evidence seized in the house of Z, of course, he still might have standing to object to its use against him. *See Brown v. United States*, 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208; *United States v. Hunt*, 5 Cir. 1974, 505 F.2d 931.

**20.** In this latter situation, the rule admitting evidence on a limited, random basis would clearly provide a more effective deterrent. This anomaly, whereby suspected criminals receive protection in their privacy interests (through the deterrent effect of the exclusionary rule) and individuals known to be innocent receive no such protection, is noted in White & Greenspan, *Standing to Object to Search and Seizure*, 118 U.Pa.L.Rev. 333, 365–66 (1970). (The authors urge the adoption of a rule like that suggested by Justice Fortas.)

**21.** *See* note 11, *supra*. *Peltier*'s suggestion that analyses under the two rationales are the same could conceivably be limited to situations in which the allegedly illegal search was perpetrated in good faith.

tion is against the very individual whose rights were violated. To the extent that the "judicial integrity" rationale is functionally indistinct from the "deterrence" rationale, the standing requirement can perhaps best be explained as an equitable judgment that only those whose rights have been violated should be able to reap the unavoidable benefits to criminals which accompany the judicial attempt to deter future police illegality.[22]

The foregoing illustrates the difficulty of pursuing a purposive analysis in an attempt to determine standing *vel non* in a fact situation not covered by previous cases. We are told that the exclusionary rule is in no way a remedy for the violation of personal rights, but that only those whose personal rights have been violated may invoke it. I turn, then, to the cases purporting to define the scope of the standing requirement, and examine them in whatever light may be shed by the competing considerations discussed above. The rule is often stated thusly:

> In order to qualify as a "person aggrieved by an unlawful search and seizure" one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.

*Jones v. United States*, 1960, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697.[23]

One reading of the distinction set out in *Jones* would require a pre-search intent on the part of the police to gather evidence relating to the individual now challenging the search. The Supreme Court has indicated, however, that this is not the test.[24] Rather, the question whether a person is a victim of a search is focused on the rights and expectations of that person. Initially the inquiry was directed to whether some property right of the individual had been violated, but, largely in response to the proliferation of electronic surveillance techniques, the Court has added a new test—when officials intrude into a tangible or intangible area in which an individual has a "reasonable expectation of privacy," that individual is a "victim" of the search.[25]

The electronic surveillance cases in which this new standard for standing has emerged contain language which seems to bear closely on the situation before us. For example, the majority in *Katz v. United States*, 1967, 389 U.S. 347, 352–53, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, stated that a caller from a phone booth

> is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.

. . . . .

. . . [W]e have expressly held that the Fourth Amendment governs

**22.** *Calandra* tells us that the exclusionary rule is not "a personal constitutional right of the party aggrieved," 414 U.S. at 348, 94 S.Ct. at 620. The Court in discussing the standing requirement, however, has often stated that "Fourth Amendment rights are personal rights which, like some other constitutional rights may not be vicariously asserted." *Brown v. United States, supra*, 411 U.S. at 230, 93 S.Ct. at 1570, quoting *Alderman v. United States, supra*, 394 U.S. at 174, 89 S.Ct. 961. While not technically irreconcilable with *Calandra*, the continued vitality of the standing requirement leaves me unable confidently to conclude that the Court has "cut the exclusionary rule *entirely* free from any personal right or neces-

sary remedy approach," Monaghan, *supra* note 10, at 4 (emphasis added).

**23.** The quoted language was intended as a construction of Fed.R.Crim.P. 41(e), but also expresses the constitutional standard. *See Alderman v. United States, supra*, 394 U.S. at 173 & n. 6, 89 S.Ct. 961.

**24.** *See* note 19, *supra*.

**25.** *See Alderman v. United States, supra*, 394 U.S. at 171–80, 89 S.Ct. 961; *United States v. Hunt, supra*, 505 F.2d at 935–41; Gutterman, *"A Person Aggrieved": Standing to Suppress Illegally Seized Evidence in Transition*, 23 Emory L.J. 111 (1974).

not only the seizure of tangible items, but extends as well to the recording of oral statements overheard without any "technical trespass under . . . local property law." . . . [T]he Fourth Amendment protects people— and not merely "areas"—against unreasonable searches and seizures.

In *Alderman v. United States*, 1969, 394 U.S. 165, 176, 89 S.Ct. 961, 968, 22 L.Ed.2d 176, the Court, after quoting the "person aggrieved" language from *Jones, supra*, held in part as follows:

[A]ny petitioner would be entitled to the suppression of government evidence originating in electronic surveillance . . . if the United States unlawfully overheard conversations of a petitioner himself . . .

Private conversations, then, are at the core of the area in which individuals may have reasonable expectations of privacy.[26] Further, it is clear that when officials wiretap a telephone, both parties to the conversation have standing to move to suppress. Thus, at least in wiretap cases, the phrase "person against whom the search is directed" apparently must be read to include a person whose identity is unknown at the initiation of the search, but whose reasonable expectations of privacy are compromised by the police in circumstances in which the

26. *Cf. United States v. Holmes*, 5 Cir. 1975, 521 F.2d 859, rehearing en banc granted, 525 F.2d 1364. In *Holmes*, the panel held that because an electronic "beeper" secretly applied to a van by police invaded a reasonable expectation of privacy, it constituted a violation of the Fourth Amendment. The court noted that the government

tries to distinguish the beeper in the instant case from the phone tap at issue in *Katz* because the latter picks up conversation, an area in which, according to the government, a citizen has an extraordinary expectation of privacy. *Id.* at 865 (footnote omitted).

27. The foreseeability requirement would seem to be necessary in order that exclusion of the evidence would serve a valid deterrent purpose.

28. Officer Rivers, testifying at the hearing on Turk's motion to suppress, said of the tape, "When I started to play it, I wanted to hear the rest of it. It's very simple." The following

police can foresee that some such person's expectations might be compromised.[27]

Although direct electronic surveillance by the Government is lacking in the unique case before us, I feel that the general principles just stated are applicable. It was foreseeable that the tapes seized from Kabbaby's car might contain discussions in which the participants would have reasonable expectations of privacy. To the extent that Kabbaby's assertion to the police that the tapes were empty mitigated the foreseeability of the invasion of privacy, the immediate discovery that the recording was one of a private phone conversation was sufficient to apprise the officers of the nature of their intrusion.[28] That Turk rapidly became a target of the continuation of their search is evidenced by the following testimony elicited from Officer Rivers (A.) during the hearing on the motion to suppress:

Q. In fact, the only reason you proceeded to listen through this whole tape was curiosity; isn't that true?

A. I wanted to hear what was on the rest of the tape, yes, sir.

Q. Searching for the possibility that there might be something incriminating there?

interchange then took place between Turk's counsel (Q) and Rivers:

Q. Was it not obvious to you that what you were doing was overhearing a conversation between two men on the phone?
A. Very obvious, yes, sir—it became obvious.
I note that Turk was apparently unaware that the conversation was being recorded (as evidenced by his concern, in the conversation, that Kabbaby have pencil and paper handy). This factor is not decisive, but does buttress the presumption that a person intends his telephone conversation to be private. Also reinforcing that presumption here are the exceptional number of "expletive deleted['s]" which appear in transcript, a phenomenon we have witnessed in transcripts of other conversations intended by the participants to remain secret. Nothing in the record appears to rebut the presumption that Turk had a reasonable expectation of privacy in this conversation.

A. Possibly, yes, sir.

. . . . .

Q. Isn't it true, in fact, what you were doing was hoping that there might be something on that tape that would lead to evidence with which you could charge Mr. Kabbaby with the commission of crimes?

A. Mr. Kabbaby or possibly the other person on the other end of the phone conversation.

The officers were aware that they were listening to a conversation in which the parties might have had reasonable expectations of privacy. The rationale, such as it is, underlying the standing requirement indicates that Turk should have standing—allowing him to move to suppress the evidence could serve the purpose of deterrence of unlawful searches, and, as a party to the private conversation overhead, Turk had a type of expectation of privacy for which the Supreme Court in other contexts has shown special solicitude.

The Government directs our attention to a different line of cases, which are said to dictate a different result. In *Hoffa v. United States,* 1966, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, the defendant argued that the Government had illegally acquired evidence against him when it received information transmitted voluntarily by a man in whom the defendant had confided. The Court concluded that the defendant had assumed the risk that his confidant would cooperate with the police, and rejected the view "that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily

confides his wrongdoing will not reveal it." *Id.* at 302, 87 S.Ct. at 413.[29]

The Government argues that the distinction between *Hoffa* and this case—that here, Kabbaby never consented to the "search"—makes no difference. I think that this distinction is very important. The decision in *Hoffa* was based on the conclusion that there was no governmental illegality. The Court there noted that Hoffa "clearly has standing" to challenge the activity he alleged to be illegal.[30] Turk may have assumed the risk that Kabbaby would tape the conversation and voluntarily take it to the police, but no case requires the holding that Turk assumed the risk that the police would illegally seize the tape.[31] The *Hoffa* line of cases, then, leaves undisturbed my initial conclusion—Turk should be considered to have standing to move to suppress the tape seized by the officers.

2. *Legality.*

There are two actions of the officers in relation to this tape which conceivably could be challenged—the initial seizure of the tape at the time of Kabbaby's arrest, and the later playing of the tape at the stationhouse. In ruling on Turk's motion to suppress, the trial court made the following statements:

. . . [I]t was a proper arrest, based on information from the confidential informant[.] I want the record to show very clearly that, if the sole question before me were whether or not this was a proper inventorying procedure, my ruling would be that it is not.

---

**29.** *See also United States v. White,* 1971, 401' U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453; *Lopez v. United States,* 1963, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.

**30.** 385 U.S. at 300, 87 S.Ct. 408. *Hoffa* does not compel the conclusion, however, that Turk must have standing. The Government could argue that the same factor which rendered its activity lawful—the cooperation of Hoffa's confidant with the police—was also the factor central to Hoffa's standing.

**31.** There is no indication in this record that Turk's "belief that a person to whom he voluntarily confide[d] his wrongdoing [would] not reveal it" was misplaced. Kabbaby never consented to the police playing of the tape. Turk did assume the risk, of course, that Kabbaby would tape the call and then behave in a manner which could enable the police to acquire a warrant to listen to the tape.

For purposes of clarification only, in other words, if the question were could the contents of this tape be used against Mr. Kabbaby, I would rule that it could not, that the playing of the tape was an illegal search by virtue of the playing, not by virtue of taking the tapes into custody or retaining them, but by playing them.

■ Appellant apparently concedes that the initial seizure of the tape was lawful, but argues that the district court was correct in concluding that the warrantless playing of the tape by the officers was improper. We agree. The Government's arguments that the playing of the tape constituted a valid inventorying procedure are, at the least, disingenuous.[32] As this Court cautioned in *United States v. Grill*, 1973, 484 F.2d 990, 991–92, *cert. denied*, 1974, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767:

> The so-called "inventory searches" can, of course, be employed as subterfuges and can be the subject of abuse. It is temptingly simplistic to employ the phrase "inventory" as though uttering it solves everything, and all too easy to state overbroadly the interests which "inventory searches" vindicate, and to automatically give to those interests a primacy which, in the balance between public and private interest, they do not necessarily enjoy.

None of the valid objectives of an inventory search required the officers in this situation to play the tape.[33] The tape could have been sealed and later returned to Mr. Kabbaby in that condition, or, if the officers had probable cause to listen to it, a warrant easily could have been obtained.[34] We refuse to hold that the officers' actions in playing the tape without a warrant were proper.

### 3. *Relief.*

Assuming that Turk had standing to object to this search, and that the search was illegal, we examine now the question of the appropriate relief. Turk objected to the requirement that he answer questions based on this evidence before the grand jury, and moved to suppress the tape and its "fruits" at his perjury trial. Shortly after Turk's grand jury appearances, the United States Supreme Court handed down *United States v. Calandra*, 1974, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561, holding that the fourth amendment exclusionary rule could not be invoked by a witness before a grand jury.[35] Our only question in regard to the use of the tape at the grand jury, then, is whether the holding in *Calandra* applies to pre–1974 grand jury proceedings.

■ *United States v. Peltier*, 1975, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374, teaches us to look to the purposes of the exclusionary rule to answer this kind of retroactivity question. Even if we assume that the prior law as expressed by lower courts was contrary to the result in *Calandra*, we can find no rationale for saying now that the tape should have been suppressed at Turk's grand jury appearance (or that Turk should not have been required to answer questions based on the tape). The "prime purpose" of the exclusionary rule is deter-

---

**32.** The contention is that the officers were concerned that Kabbaby might later complain that the tape had been altered or erased. I note that Kabbaby had told the officers that nothing was on the tape.

**33.** *Cf. United States v. Ducker*, 5 Cir. 1974, 491 F.2d 1190, 1192, where we said, in discussing an inventory search of a car:

> Inventory searches have two purposes: to protect the vehicle and the property in it, and to safeguard the police or other officers from claims of lost possessions.

**34.** *Cf. United States v. McDevitt*, 10 Cir. 1974, 508 F.2d 8, 12–13 & n. 4 ("It is difficult to understand why the officers would proceed without seeking a warrant . . . .").

**35.** *See United States v. Worobyzt*, 5 Cir. 1975, 522 F.2d 196. If Title III of the Omnibus Act applied to this search, 18 U.S.C. § 2515 might compel a different conclusion in respect to relief available before the grand jury. *See United States v. Worobyzt, supra; United States v. Calandra, supra*, 414 U.S. at 355 n.11, 94 S.Ct. 613; *Gelbard v. United States*, 1972, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179.

rence of future illegal searches; a holding that illegally seized evidence should have been suppressed at pre-*Calandra* grand juries could have absolutely no deterrent effect, because *Calandra* rules the future. The *Calandra* majority was unimpressed with arguments that the "judicial integrity" rationale mandated exclusion of the evidence,[36] and we see no reason why this unstated view of the norms of judicial integrity at grand juries is not controlling in the case before us. There was no error in the use of the tape at the grand jury.

 We turn, then, to appellant's claim that the tape should have been suppressed at his perjury trial. Again we must refer to the purposes of the exclusionary rule, and attempt a balancing process like that reflected in *Calandra*. We note first that the exclusion of the tape could have only minimal deterrent effect. The Government granted immunity to Turk, so that none of his truthful statements to the grand jury might be used against him.[37] Knowing this, and knowing that the Government had seized the tape and was familiar with its contents, Turk proceeded to commit a new crime—perjury—specifically exempted from the immunity order. For suppression of the tape at the perjury trial to have any significant deterrent effect, we would have to assume that the police could be so confident that an immunized search victim would prevaricate before a grand jury that they would be willing to seize evidence of a crime illegally, and thus to forego the possibility of direct prosecution. We refuse to make such an assumption. Undoubtedly, suppression would have more deterrent

effect than failure to suppress in this situation, but the fourth amendment does not require the "adoption of every proposal that might deter police misconduct."[38] When the Government is effectively denied the possibility of direct prosecution on the basis of illegally seized evidence, no significant additional deterrent effect could be realized by suppressing the evidence at a trial of the search victim for a crime committed after the illegal search and with the knowledge that the illegal search occurred.[39]

 Similar considerations lead to the conclusion that the other side of the balance—the "good" to be realized by permitting the evidence to be used—is perhaps even weightier here than in cases of direct prosecution on the basis of illegally seized evidence. The usual factor that the evidence is probative and reliable is present, but another factor is also apparent. This is perhaps best stated in the negative—a holding that the tape should be suppressed in these circumstances would in effect give the victim of an illegal search a license to commit any new crimes he cared to, free from the concern that the illegally seized evidence might be used against him in prosecutions for these subsequent crimes. Avoiding the issue of such a license is a "good" to be realized by admitting the evidence here. We hold, then, that evidence obtained in an illegal search may properly be admitted in the perjury trial of a victim of the search when the alleged perjury occurred after the search and with the knowledge on the part of the victim that the search had taken place.[40]

36. *See* note 11, *supra*.

37. *See* 18 U.S.C. § 6001 et seq.; *Kastigar v. United States*, 1972, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212.

38. *United States v. Calandra, supra*, 414 U.S. at 350, 94 S.Ct. at 621. *See also Alderman v. United States, supra*, 394 U.S. at 174, 89 S.Ct. 961.

39. The situation might be very different if Turk had not known before he testified that Kabbaby had recorded the conversation and

that the officers had seized and listened to the tape. Arguably, there would be a deterrent value in prohibiting the surprise use of illegally seized evidence to obtain a perjury conviction. In the situation before us, however, Turk was the master of his own fate, and he ran onto the shoals of perjury with his eyes wide open. •

40. The strength of the other evidence of Turk's perjury indicates that we might conclude that the admission of the tape itself into evidence was at most harmless error. The question

## III. OTHER ISSUES

### A. *Use of Grand Jury Testimony*

Turk contends that the Government violated the terms of the use immunity order which covered his grand jury testimony. His specific allegation is that the Government was able to use his truthful identification of the "Glenn" referred to on the tape as Glenn Roblin to locate Roblin, who became perhaps the major witness against Turk at the perjury trial. Turk relies on *United States v. Hockenberry*, 3 Cir. 1973, 474 F.2d 247, which held that an immunized witness' truthful statement to a grand jury could not be used to impeach him as a witness in his own trial on charges of making unrelated false statements to that same grand jury. Turk asks us to extend the principle of *Hockenberry* to cover a situation in which the Government seeks to use not the truthful statement itself, but rather evidence derived from the truthful statement, in a subsequent prosecution of an immunized grand jury witness.

We need not decide if *Hockenberry* fruits are as toxic as the *Hockenberry* bush, however, because another consideration convinces us that the Government had no need to use Turk's statement to identify the "Glenn" on the tape as Glenn Roblin. The police seized the tape from the car in which they had found and arrested Kabbaby and Glenn Roblin, long before Turk's grand jury testimony. To suggest that, absent Turk's answer, the police might never have guessed the identity of the "Glenn" referred to in the conversation between Kabbaby and Turk is to suggest an investigative incompetence we cannot assume. There is no indication that these cops were of the Keystone variety, and we are confident that the Glenn in the car would have occurred to them as a possibility for the identity of the Glenn referred to on the tape.

### B. *The Charge on "Reasonable Doubt"*

The trial court's final charge to the jury contained the following:

A defendant in a criminal case is presumed by law to be innocent. That presumption remains with him throughout the trial unless and until he is proven guilty of the crimes charged by credible evidence beyond a reasonable doubt.

The burden of proving a defendant guilty beyond a reasonable doubt rests upon the Government. This burden never shifts throughout the trial.

The law does not require a defendant to prove his innocence or to produce any evidence. He may rely upon evidence brought out on examination of witnesses for the Government, and if the Government fails to prove that defendant guilty beyond a reasonable doubt, the jury must acquit him.

A reasonable doubt, as it is used in these instructions, means a doubt that is based on reason and common sense. Such doubt must be substantial rather than speculative, that is, a defendant is never to be convicted upon mere suspicion or conjecture.

Such doubt, however, must be a doubt that is reasonable and one which arises from the evidence or lack of it. It does not mean a mere possible doubt or a speculative, imaginary or forced doubt, because anything relating to human affairs is open to some possible or imaginary doubt.

The defendant objected to this charge, asking that his requested instruction be

---

would remain, however, of whether the other evidence was sufficiently attenuated from the illegal seizure so as not to be considered "fruit of the poisonous tree." *See Wong Sun v. United States, supra* note 15; *United States v. Houltin,* 5 Cir. 1976, 525 F.2d 943. We do not reach that question, because our conclusion that the tape was admissible necessarily applies to the "fruit." *See United*

*States v. Calandra, supra,* 414 U.S. at 354, 94 S.Ct. 613.

Our rationale is akin to that in "attenuation" cases, but differs in that rather than finding the fruit sufficiently removed from the tree, we have found that any toxin in the tree itself evaporated when it was uprooted and transplanted into a trial for a new and different crime.

read in place of the language above which defines reasonable doubt. The only significant change which would have resulted from this would have been the omission of the paragraph which begins "A reasonable doubt, as it is used . . .," and the substitution for it of the following:

A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that you would not hesitate to act upon it in the most important of your own affairs.

▇▇▇▇ The charge requested by the defendant clearly would have been appropriate.[41] We have specifically urged district courts to employ "would not hesitate" language in their reasonable doubt instructions,[42] and we reiterate that plea today. Except for one sentence in the charge given by the trial court, however, we could conclude that "the judge has made an accurate and correct charge" and thus that "the extent of its amplification must rest largely in his discretion." [43]

▇▇▇ The offending sentence reads, "Such doubt must be substantial rather than speculative, that is, a defendant is never to be convicted upon mere suspicion or conjecture." Appellant argues that this constitutes reversible error, citing United States v. Alvero, 5 Cir. 1972, 470 F.2d 981. The instructions given in that case, however, were clearly prejudicial to the defendant.[44] By contrast, the problem with the present sentence lies in its ambiguity—the "that is" introduces a clause which is in no way a paraphrase or explanation of the preceding clause. This very ambiguity, however, undermines Turk's contention that he was prejudiced by the phrase, "such doubt must be substantial." The end of the sentence makes the instruction read as if it were one meant to favor the defendant.

Reading the entire charge given by the court in context, see United States v. Steinkoenig, 5 Cir. 1973, 487 F.2d 225, 230, we cannot say that the inclusion of one ambiguous sentence and the failure to include the desirable "would not hesitate" language rose to the level of reversible error. The charge as a whole, while not perfect, "conveyed the proper idea," id., and any error that might be found in the ambiguous sentence was harmless.[45]

**41.** We note that the Government requested almost exactly the same instruction on reasonable doubt as that requested by Turk, the only difference being that the Government would say " . . . you would be willing to act upon it unhesitatingly . . . " rather than " . . . you would not hesitate to act upon it . . . " The Government did not, however, object to the charge given by the court.

**42.** United States v. Richardson, 5 Cir. 1974, 504 F.2d 357, 361. See id. at n. 10 for a list of similar pleas from other circuits. Richardson disapproved the use of "would be willing" and approved "would not hesitate," but refused to find the error to be substantial enough to mandate reversal in the absence of objection. Turk did request a "would not hesitate" instruction, of course, but since the court here did not give the "would be willing" language, any error committed here was in that respect less egregious than that in Richardson.

**43.** Cf. United States v. Bayer, 1947, 331 U.S. 532, 536, 67 S.Ct. 1394, 1396, 91 L.Ed. 1654; United States v. Clark, 5 Cir. 1975, 506 F.2d 416, 418; United States v. Banks, 5 Cir. 1973, 485 F.2d 545, 549, cert. denied, 1974, 416 U.S. 987, 94 S.Ct. 2391, 40 L.Ed.2d 764.

**44.** The instruction in Alvero was as follows:

It is not a speculative doubt, but any substantial reasonable doubt, common, ordinary horsesense doubt. It is one that remains after all the evidence is in that would cause a reasonable person to entertain a reasonable and proper doubt; a very substantial doubt, let me put it that way, of the guilt of the defendant. Then, of course, you must find him not guilty.
470 F.2d at 982–83. Both defendant and the Government objected to this language, and we held that even a curative instruction was insufficient to cure the prejudice caused by the phrase "very substantial doubt."

**45.** See Kotteakos v. United States, 1946, 328 U.S. 750, 769–65, 66 S.Ct. 1239, 90 L.Ed. 1557; United States v. Steinkoenig, supra, 487 F.2d at 229.

## CONCLUSIONS

To recapitulate: there was no "interception" by the officers in this case which could trigger the protections or sanctions of Title III of the Omnibus Act; Turk had standing to challenge the officers' playing of the tape, and such playing violated the fourth amendment, but even so, the policies underlying the exclusionary rule indicate that the tape was properly admitted into evidence at Turk's perjury trial; the Government did not violate the terms of the immunity order by using Turk's truthful statements to the grand jury against him; and, any error in the court's instruction on reasonable doubt was harmless. The judgment is

Affirmed.

DYER, Circuit Judge, with whom GEWIN, Circuit Judge, joins, specially concurring:

Since I agree that, even if Turk has standing to challenge the search and seizure, the introduction of the seized evidence at the perjury trial was not error, I would pretermit deciding the standing issue.