STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

John R. WEBER, Defendant-Appellant-Cross
Petitioner.†

.

Supreme Court

*No. 90–0181–CR. Argued March 27, 1991.—Decided June 25,
1991.*

(Also reported in 471 N.W.2d 187.)

†Motion for reconsideration pending.

For the plaintiff-respondent-petitioner the cause was argued by *David J. Becker,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

For the defendant-appellant there were briefs and oral argument by *Charles Bennett Vetzner,* assistant state public defender.

DAY, J. This is a review of an unpublished court of appeals decision which reversed a judgment of conviction of the defendant by the circuit court for Price county, the Honorable Gary L. Carlson, presiding. The

defendant, John R. Weber, was charged with eighteen counts of criminal activity arising out of two criminal episodes: one involving his wife, Emily Weber, which took place on September 3 and 4, 1988, and the other involving his sister-in-law, Carla Lenz, which took place on November 12 and 13, 1986. The criminal activity included the murder of Carla and the attempted murder of Emily, and the sexual assault, kidnapping, and false imprisonment of both of them. While the police were searching the defendant's car and taking inventory of its contents, they played an unmarked audio cassette tape which was resting in the car's tape player. The tape contained a full confession by Weber, revealing the acts of torture and brutality he committed against Carla before killing her, two years earlier. The tape was subsequently admitted into evidence at the defendant's trial over the objections of his counsel.

The issues on review are, first, whether the playing of the unmarked audio cassette tape, found in the defendant's car, violated his constitutional right to be free from unreasonable search and seizure; second, if there was an unreasonable search and seizure, should this court adopt the good faith exception to the exclusionary rule or adopt a balancing test for the exclusionary rule's application; third, did the court of appeals violate the defendant's constitutional right to appeal his convictions when it concluded that the counts involving Emily Weber were not subject to appeal; and fourth, did the preclusion of appellate review of the counts concerning Emily Weber render the defendant's guilty plea unknowing and involuntary because it was premised on the right to such review.

We conclude that the playing of the unmarked audio cassette tape was not an unreasonable search under the fourth amendment. Because of our holding on the first

issue, we do not reach the second issue. The basic issue of withdrawal of his guilty plea to the counts concerning Emily, involved in the third and fourth issues, we decide against the defendant.

The facts of this case are largely undisputed. On September 3, 1988, at about 5:30 p.m., the defendant induced his wife, Emily, to take a ride with him, representing that he had a "surprise" for her. After a short drive, the defendant stopped the car at his parents' vacant farm property. He asked Emily to turn her head and look out the window, which she did. The defendant then held a knife to her throat and proceeded to commit a variety of offenses against Emily, including taping her eyes and mouth shut, taping her hands so they were bound behind her back, beating her with his fists and a metal shovel, cutting her breast and legs with a knife, burning her with a lighted cigar on the body and in her vagina, and repeatedly sexually assaulting her with a wheelbarrow handle. Emily lapsed into unconsciousness. At dawn, on the morning of September 4, the defendant drove Emily home. The defendant fabricated a story which he ordered Emily to tell if she was questioned about her injuries. The defendant then attempted to wash Emily in the bathtub and tend to her injuries. When he realized that she needed medical attention, he called Emily's mother who took her to the Flambeau Medical Center where she was put in intensive care. She was in the hospital sixteen days.

At about 9:30 on the evening of September 4, the defendant stopped at the police department on his way home from the hospital to give the police the details of the assault as he claimed Emily had described it to him. He told the police that three strangers had attacked Emily. On September 5, at about 11:45 a.m., Phillips Chief of Police, Craig Moore, went to the hospital to

interview Emily. She told him the same lie the defendant had fabricated. Chief Moore interviewed Emily again on that same day, at about 12:45 p.m. This time she told him it was her husband who had attacked her, and she described the assault in detail, giving a description of the defendant's car, the wooded area where he took her, and the clothing she had been wearing on the night of the attack. The defendant, who was also at the hospital at this time, was placed under arrest. The keys to his unlocked car were confiscated, and the car was moved by a wrecker service to the Price County Sheriff's Department.

At about 10:30 p.m., September 5, the search warrants for the defendant's car and house were obtained, listing various items of clothing worn by Emily during the assault and the knife with which she was threatened. A police officer and Chief Moore, accompanied by a deputy sheriff and two other officers, one serving as a photographer, began to search the defendant's car. Because it was such a mess, filled with so much debris, efficiency warranted emptying the car and logging each item as it was removed.

Chief Moore testified:

[A]t approximately 11 o'clock in the evening the search warrant was served on that automobile. I had my assistant chief Dennis Dosch do the actual search, in other words to go through the vehicle in search for the items on the search warrant. I then as he found an item I would then document it in preparation for the return to the Court.

When we first began that search warrant, we noticed that the car had a lot of items in it.

It was, there was a lot of junk laying around and we decided that at that time to then go through that car inch by inch and to remove all the items that were in

the car and log and document all the items that were in that car.

Of course searching continually for the items listed on the search warrant.

(Transcript of Proceedings, March 14, 1989, p. 118.)

The car was emptied, beginning with the front seat of the driver's side, floorboard to ceiling, followed by the front seat of the passenger's side. Two hours into the inventory of the car, an officer came across an unmarked audio cassette tape resting in the tape player. By this time, the knife and some, but not all of the items of clothing had been recovered. The tape was not sufficiently inserted in the player to cause it to play when the ignition key was turned. Chief Moore turned the ignition key to the accessory position and pushed the tape in the player, activating it. He immediately recognized the voice of the defendant, addressing his wife, detailing a series of brutal and vile acts of torture he claimed to have committed against Carla Lenz, Emily's sister. Carla had disappeared from the area two years earlier.[1]

---

[1]On direct examination at the evidentiary hearing, Chief Moore described the playing of the tape:

**Q** **(District Attorney Barnett)** And what relation does that tape in the cassette player that's depicted on photograph Exhibit No. 5 have to the cassette tape that was listened to?

**A** **(Chief Moore)** It is the same cassette tape.

**Q** Now, what was necessary in order to listen to that cassette tape?

**A** As I recall I turned the key of the vehicle to accessory and pushed the tape into the workings of the tape player.

**Q** Did it require that you actually turn the engine of the car over?

**A** No, it did not.

(Transcript of Proceedings, December 19, 1988, p. 59.)

Prior to playing the tape found in the cassette player, the officers observed and inventoried another tape, which was listed on the warrant return as ".38 Special Flashback Tape, Neil Young Harvest Daken 'Under Lock and Key.' " At this same time, seven other tapes were observed on the floorboards of the front passenger side seat and set aside. These seven tapes, along with the remainder of the items later found in the car, were inventoried on the warrant return, packaged, and removed from the floor of the Sheriff's Department garage at approximately 1:00 the next morning.

Chief Moore listened to the entire ninety-minute tape, including the graphic recitation of the acts of brutality and mayhem the defendant performed on Carla prior to her murder. This description of the attack on Carla was in the form of a statement to Emily.

The defendant described how he got his sister-in-law, Carla Lenz, to go for a ride with him on a cold November day ostensibly to talk about his marital problems. He parked the car in a secluded area. Shortly thereafter he shoved a .25 caliber pistol in her mouth—forced her to disrobe, put duct tape over her mouth, tied her wrists together, burned her nipples with a lighted cigarette—slapped her breasts and head with a board. He then pulled her out of the car, hit her several times with a plank, forced her to perform fellatio and

\* \* \*

**Q** **(District Attorney Barnett)** Was there any—How would you describe the cassette itself from the—your observation of it in terms of whether it had any markings or printing or anything that would identify that tape as being a music cassette tape?

**A** **(Chief Moore)** From what I could see of the tape, it was unmarked. It was just black plastic. That's all I could see of it was just an edge of it.

*Id.* at p. 60–61.

125

oral-anal contact on him. He then forced a wheelbarrow handle into her vagina, another handle into her rectum and stuck fifty pins into her breast and nipple. He then used a hypodermic needle to inject lighter fluid into her breast after which she became unconscious and he "stepped on her throat till she died." Two days before he had dug a grave to bury her in. He drove around with her body in the trunk of his car for five days and then buried her. He then described similar acts he planned to do to his wife.

After listening to the tape, Chief Moore had the defendant removed from his jail cell for interrogation. When the defendant denied having any involvement in the death of Carla Lenz, Chief Moore told the defendant he heard the tape he had made. The defendant then drew the officer a map which showed where the body of Carla Lenz was buried. The remains which were located, as depicted on the map, were identified as those of Carla Lenz.

During the interview with Emily Weber on September 5, 1988, she did not mention the cassette tape. But in a subsequent interview, on September 7, after the tape had been discovered, she mentioned the tape to Chief Moore. He described the conversation at trial:

> I asked her if she had ever listened to the tape that was in the cassette player of the car. She stated that she had not. She observed a tape in the tape player, and at one time while driving into the woods area she had pushed that tape in. She stated that John had mentioned the tape, a tape, to her off and on, and she thought it had something to do with this surprise. So, she was going to find out what the surprise was and pushed the tape player in, and with that John responded with shutting the tape player off and telling her that she could not listen to it at this time.

126

(Transcript of Proceedings, December 19, 1988, p. 72.)

The defendant had not told Emily what was on the tape, nor did he play it for her.

During this same interview with Chief Moore, Emily Weber revealed that while the defendant was hitting her over the head with a shovel, he told her, "I am going to kill you like I did Carla." He also said that Emily was going to be a "tough one to kill."

On October 10, 1988, a preliminary hearing was held on a series of eighteen charges against the defendant with respect to Emily Weber and Carla Lenz. At its conclusion, the defendant was bound over for trial.

On November 14, 1988, the defendant filed a "motion to quash search warrant," in which he sought the suppression of all physical evidence seized during the search of his car. Specifically, the defendant requested the suppression of the tape discovered in the cassette player of the car.

On February 16, 1989, the circuit court orally denied the defendant's motion to suppress. The judge was of the opinion that the search and seizure of the tape was justified under the plain view doctrine or under the inventory exception to the warrant requirement.

The case proceeded to trial on March 6 through March 18, 1989. The audio cassette tape, with certain "prejudicial portions" omitted, was played for the jury at the guilt phase of the trial. (The original unedited tape was played to the jury at the insanity phase of the trial, which is not subject to this review.)

With regard to the victim Carla Lenz, the defendant pled guilty to charges of first-degree murder and kidnapping, and was found guilty by the jury of seven counts of first-degree sexual assault, one count of false imprisonment, and one count of mayhem with use of a dangerous weapon.

127

He pled guilty to a charge of attempted murder, kidnapping, false imprisonment, battery, and three counts of first-degree sexual assault with respect to the other victim in this case, Emily Weber. The circuit court entered judgment, convicting the defendant of all eighteen counts in the information and sentencing him to a total of life plus 164 years and nine months.

The defendant appealed all eighteen counts of his conviction, requesting the court of appeals to grant him a new arraignment on the nine counts to which he pled guilty and a new trial on the remaining nine counts on which he was found guilty by the jury. The sole issue on appeal was the constitutionality of "searching" or playing the audio cassette tape.

The majority of the court of appeals concluded that because the playing of the tape by the police officer was without probable cause, the "plain view" doctrine could not be used to justify a search of the tape's contents. In addition, because the tape was "completely unrelated to the objects sought" in the crimes against Emily, and because the police had no basis for believing the tape disclosed evidence of any other crime, the playing of the tape could not be justified. Unable to "discover any authority that would permit the lawful search of the tape's contents," the court reversed the defendant's conviction on the charges relating to Carla Lenz. The court stated that the defendant's convictions against Emily Weber, to which he was sentenced to sixty-three years confinement, was not subject to the appeal.

Judge Cane, in a concurring opinion, voiced his concern with the application of the exclusionary rule to the circumstances of this case. In this case, the exclusionary rule had little, if any, deterrent effect against police misconduct. The officer's "misconduct" was an innocent act of playing a tape cassette found at the scene of the crime.

Judge Cane proposed a balancing test which considers the nature and degree of the police intrusion, balancing the need to search or seize against the invasion which the search or seizure entails. But unfortunately, he noted, it is not the province of the court of appeals to create such a test, and the evidence must therefore be excluded.

We granted the State's petition for review of the decision of the court of appeals, which suppressed the tape. We also granted the cross-petition of the defendant which we address at the outset.

The defendant cross-petitioned for review of the court of appeals' decision which ruled that the issue of his conviction following a plea of guilty to the counts involving the attempted murder of Emily, "are not subject to this appeal." The defendant's theory is that such guilty plea was only entered because the motion to suppress the tape was denied, and that the defendant believed he had a right to appeal convictions on the charges concerning Emily and requested withdrawal of his guilty plea if the appeals court ordered suppression of the tape.

The State argued "harmless error" before this court because of the overwhelming evidence against the defendant on the charges against Emily even if this court upheld the suppression of the tape. We do not reach that issue.

■

Because we hold that the tape was properly entered into evidence, there is no basis to permit the defendant to withdraw his guilty plea to the charges involving Emily. The defendant's request to allow him to withdraw his guilty plea is therefore denied.

Unreasonable searches and seizures are governed by Art. I, sec. 11 of the Wisconsin Constitution. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

■ To prevent confusion caused by differing standards, "this court has consistently and routinely conformed the law of search and seizure under the state constitution to that developed by the United States Supreme Court under the fourth amendment." *State v. Fry,* 131 Wis. 2d 153, 172, 388 N.W.2d 565, *cert. denied* 479 U.S. 989 (1986). We choose to do so in this case. The Fourth Amendment to the United States Constitution, which is substantially similar to Art. I, sec. 11 of the Wisconsin Constitution, provides:

> The right of the people to be secure in their persons, houses, papers, and effects,[2] against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The fourth amendment is applicable to the states through the due process clause of the fourteenth amendment. *Mapp v. Ohio,* 367 U.S. 643, 655 (1961). The defendant contends that the "search"[3] of the audio cas-

---

[2]"Vehicles are 'effects' within the meaning of the Fourth Amendment." *Cady v. Dombrowski,* 413 U.S. 433, 439 (1973).

[3]This court has stated that "[a] search implies a prying into hidden places for that which is concealed." *Edwards v. State,* 38 Wis. 2d 332, 338, 156 N.W.2d 397 (1968). The United States

130

sette tape—the playing of the tape—was unconstitutional. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions (footnotes omitted)." *Katz v. United States,* 389 U.S. 347, 357 (1967). There is no dispute of the fact that the tape was not an item listed in the search warrant. The "search" or playing of the tape, therefore, was conducted outside the judicial process. In order to uphold the search as reasonable, it must fit into one of the exceptions to the search warrant. "Some of the exceptions are consent to search, search incident to arrest, a probable cause search, an exigent circumstance search, a police inventory search, and an automobile exception to warrantless search." *Thompson v. State,* 83 Wis. 2d 134, 139, 265 N.W.2d 467 (1978).

The record is clear that the defendant did not consent to the playing of the tape. The tape was not "searched" incident to the defendant's arrest, since the search was not a "contemporaneous" incident of the arrest. *New York v. Belton,* 453 U.S. 454, 460 (1981), *reh'g. denied,* 453 U.S. 950 (1980). *See also,* sec. 968.11, Stats. 1989–90 (search must be within arrestee's immediate presence). The record does not reveal that there was probable cause to "search" or play the tape. The playing of the tape cannot be justified because of exigent circumstances either, because the playing of the tape was not undertaken in an exigent or emergency situation, *i.e.* a situation where a person is in distress or in need of

Supreme Court has not defined specifically what is a "search," but in its decision in *Arizona v. Hicks,* it went as far as to consider the moving of stereo equipment in order to record their serial numbers a "search" under the fourth amendment. 480 U.S. 321, 324 (1987).

assistance. *State v. Prober,* 98 Wis. 2d 345, 360–361, 297 N.W.2d 1 (1980).

## I.

Since the playing of the tape took place when the police were inventorying the contents of the car, we next consider the inventory exception to the warrant requirement. Although an inventory search is a "search" within the meaning of the fourth amendment, *State v. McDougal,* 68 Wis. 2d 399, 406, 228 N.W.2d 671 (1975), it is also a well-defined exception to the warrant requirement. *Illinois v. Lafayette,* 462 U.S. 640, 643 (1983). The United States Supreme Court, in *South Dakota v. Opperman,* 428 U.S. 364, 369 (1976) summarized the nature of an inventory search:

> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, . . . the protection of the police against claims or disputes over lost or stolen property, . . . and the protection of the police from potential danger . . .. The practice has been viewed as essential to respond to incidents of theft or vandalism (citations omitted).

An inventory search is administrative by nature, not an investigation motivated by a search for evidence. The justification for an inventory search, therefore, does not rest on probable cause. *Opperman,* 428 U.S. at 370 n.5. To determine the reasonableness of an inventory search, we must balance its intrusion on the defendant's fourth amendment interests against its promotion of

legitimate governmental interests. *Lafayette,* 462 U.S. at 644. The reasonableness must be based on the facts and circumstances of each case. *State v. Callaway,* 106 Wis. 2d 503, 511, 317 N.W.2d 428, *cert. denied,* 459 U.S. 967 (1982). This is a two-step process, involving the reasonableness of the intrusion in the first instance, followed by the reasonableness of the scope of the intrusion. *McDougal,* 68 Wis. 2d at 410. Since the defendant does not challenge the reasonableness of impounding the vehicle and the reasonableness of the inventory itself, we move to the second aspect, the reasonableness of the scope of the inventory.

The "scope of an otherwise valid inventory search is limited by the purpose for which it is undertaken." *Callaway,* 106 Wis. 2d at 515. In the case before the court, Chief Moore stated that the inventory search was performed because the car was such a mess and it would have been difficult to "comb" the entire car to find the items in the search warrant.

> That particular vehicle, your Honor, was—was a mess, full of junk; and the only proper way to try to find the items listed in the search warrant was to log each item as we came to it piece by piece; and we set aside and continued throughout that vehicle until we were able to see what was on the bottom of all this junk. So, that process involved documenting each particular item that was picked up out of—in that vehicle, picked up by hand; and I then documented that item and it was then set aside within the enclosed confines of that middle stall of the Sheriff's Department garage.

(Transcript of Proceedings, December 19, 1988, p. 34.)

133

\* \* \*

**Q.** **(District Attorney Barnett):** All right. So, if I understand it your role in respect to the execution of that search warrant was basically to list the items that Officer Dosch came upon during his actual conducting of the search?

**A** **(Chief Moore):** That's correct.

*Id.* at 26.

The items which were removed from the car were packaged and stored in Chief Moore's office. *Id.* at 35–36.

As this court stated in *State v. Prober,* "Police cannot reasonably be expected to defend against claims of loss, whether legitimate or false, reasonable or unreasonable, if they are not permitted to catalog what they took into custody." 98 Wis. 2d at 354, 297 N.W.2d 1; and as the United States Supreme Court stated in *Colorado v. Bertine,* an "inventory search" case, "[k]nowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence." 479 U.S. 367, 373 (1987).

■

We do not consider it unreasonable for a police officer to have listened to the tape, under these circumstances, in order to properly inventory it on the warrant return. In the course of the search the police also found eight other cassette tapes. These tapes were labeled so that their contents, music by various artists, was readily ascertainable. In order to document the unmarked tape, it would have been necessary to listen to it to find out what was on it.

In *McDougal,* the court stated:

> We recognize the right of the police to conduct an inventory search of an impounded vehicle to protect themselves against false claims of loss of property while the vehicle is in police custody, and conclude the inventory search of the vehicle in question as to all items in plain view was proper. However, in view of the federal and state prohibitions against unreasonable intrusions into the privacy of individuals, the police cannot engage in an unlimited search under the guise of a police inventory search.

68 Wis. 2d at 413, 228 N.W.2d 671. We hardly view the playing of this tape a "fishing expedition" or an "unlimited search under the guise of a police inventory search." The record is void of any showing that the police were acting for the purpose of investigation. To the contrary, the record is clear that the police were following standard inventory procedures. In light of the fact that the other eight cassette tapes were of music, it would be logical to think that the unmarked tape also included music. Moreover, it would be reasonable to play the tape to specifically identify it on the warrant return in the same manner that the first tape which was inventoried was identified.[4]

It can be argued that the inventory objectives of the police could have been achieved in a "less intrusive" manner, perhaps by just logging the unmarked tape as

---

[4]The seven other tapes which were set aside before the unmarked tape was discovered were listed in the warrant return as:

Tape, Best of Bread
Tape, CCR Gold
Tape, Road Songs
Tape, Docken
Tape, Heavy Metal, Music from Motion Picture
Tape, America History/American Greatest Hits
Tape, Bee Gees

"unmarked" without determining its identity (as it was inventoried after it was played). After all, all the other tapes that were removed from the car were labeled. The Supreme Court, faced with a similar argument in *Illinois v. Lafayette,* concluded that:

> [T]he real question is not what 'could have been achieved,' but whether the Fourth Amendment *requires* such steps; it is not our function to write a manual on administering routine, neutral procedures of the station house. Our role is to assure against violations of the Constitution.

> The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means.

462 U.S. at 647.

Similarly, it is not our function to write a manual on police inventory procedures. At the time the unmarked tape was discovered, the police had no way of knowing that it would have been the only unmarked tape in the car. It would have been unreasonable for the officers to make such a fine subtle, distinction at two o'clock in the morning, two hours into the inventory of the car, in deciding whether the first unmarked tape that was found should have been specifically identified and inventoried, like the first tape that was inventoried, or merely labeled "unmarked." *See generally id.* at 648.

The defendant would have us view the tape as a container and, even in the course of an inventory search, exclude the tape under the law of search and seizure of containers. The Supreme Court has defined a container as "any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or their receptacles located anywhere within the passenger

compartment, as well as luggage, boxes, bags, clothing, and the like." *New York v. Belton,* 453 U.S. at 460 n.4.

We do not consider the audio cassette tape a container, any more than one might consider a 35mm slide a container. Granted, the wound tape is covered partially by some protective plastic, just as a slide is covered partially by some protective plastic or cardboard. But the audio cassette tape, in and of itself, is not capable of holding another object as a container is. In fact, an audio cassette tape typically is purchased *in* a container—a plastic case. Had the tape been found in its container, perhaps a different question might arise. We therefore do not consider the "container cases" cited by the defendant authoritative for suppressing the tape, and we hold that the playing of the tape was reasonable under the inventory exception to the warrant requirement.[5]

The remaining exception to the warrant requirement which we will consider is the automobile exception. A warrantless search of an automobile is justified when the police have probable cause to believe that an automobile, found in a public place, contains evidence of a crime; no showing of exigent circumstances is required. *State v. Tompkins,* 144 Wis. 2d 116, 137–138, 423 N.W.2d 823 (1988). Emily Weber gave Chief Moore a detailed description of the assault, including a statement that the defendant initiated the kidnapping, false imprisonment and assault in his car. Clearly probable

---

[5]Since we do not view the tape as a container, it is not dispositive that the record does not contain a police policy regulating the opening of containers found during an inventory search. *See Florida v. Wells,* — U.S. —, 110 S. Ct. 1632, 1635 (1990).

cause existed to search the automobile. In addition, the defendant's car, unlocked, was in the hospital parking lot when the defendant was arrested. A warrantless search of the defendant's car is justified. The defendant does not dispute this conclusion.

What the defendant does dispute is the scope of the search of his car. "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire,* 403 U.S. 443, 461 (1971), *reh'g. denied,* 404 U.S. 874 (1970). Yet "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Opperman,* 428 U.S. at 367. This is due to the inherent mobility of automobiles, the periodic inspection and licensing requirements of automobiles, and the public nature of automobile travel where both its occupants and contents are in plain view. *Id.* at 368.

The Supreme Court in *United States v. Ross,* addressed the scope of a warrantless search of an automobile. 456 U.S. 798, 824 (1982). In that case, police officers, acting on the word of an informant, approached a parked car from which the defendant, Ross, was believed to have been selling narcotics. *Id.* at 800. The officers searched the interior of the car and found a bullet on the front seat and a pistol in the glove compartment. *Id.* at 801. They arrested and handcuffed Ross. *Id.* Since the officers were informed that Ross was selling the drugs from the trunk of his car, one of the officers took Ross' keys and opened the trunk where he discovered a closed brown paper bag. *Id.* He opened the bag and found several glassine bags containing white powder. *Id.*

In addressing the scope of the search, the Court stated that:

138

> [T]he scope of a warrantless search based on probable
> cause is no narrower—and no broader—than the
> scope of a search authorized by a warrant supported
> by probable cause.
>
> &ast; &ast; &ast;
>
> The scope of a warrantless search of an automobile
> thus is not defined by the nature of the container in
> which the contraband is secreted. Rather, it is
> defined by the object of the search and the places in
> which there is probable cause to believe that it may
> be found.[6]

*Id.* at 823-24. Since both the trunk and the bag might
have contained narcotics, the search was reasonable. *Id.*
at 821-823. Despite the fact that *Ross* is a "container
case," we consider it instructive insofar as it addresses
the scope of a warrantless search of an automobile.

In the case before the court, the scope of the war-
rantless search of the defendant's car based on probable
cause could be no narrower and no broader than a search
supported by a warrant based on probable cause. The
question then becomes, was it reasonable for the police
to play the tape in the search of the defendant's car,
based on probable cause?

Before the search warrant was obtained and exe-
cuted, the police knew that the defendant transported
Emily Weber to the scene of the crime in the car; they
also knew that the defendant initiated the assault on
Emily Weber in the car; they knew the details of the
assault, involving a knife, duct tape, and a wheelbarrow
handle, and they knew what Emily Weber had been

---

[6]The principles in *Ross* were reaffirmed by the Court in
*California v. Acevedo,* — U.S. —, 111 S. Ct. 1982 (1991).

wearing on the night of the attack. What Emily Weber knew of the assault, she told Chief Moore during the interview with him on September 5, 1988. What she did not tell him during this interview, was that the unmarked audio cassette tape contained or could have contained evidence of the defendant's intent to kill her and his confession of the assault and murder of Carla Lenz.

Under the standard of *Ross,* the police, in a warrantless search of the defendant's car, could search the car for what they knew to be evidence of the crimes against Emily Weber. Under the circumstances, the police had no idea, when they were searching the car, that the tape could have been evidence, subject to a search. The playing of the tape was outside the scope of the warrantless search based on probable cause. Even though the tape was in plain view, the search of an object in plain view cannot be sustained on any lesser grounds than the seizure of an object in plain view. *Arizona v. Hicks,* 480 U.S. at 327–328. Probable cause is required. *Id.* at 328. We therefore hold that the "search" or playing of the tape cannot be upheld under the automobile exception to the warrant requirement.

### III.

Assuming that the "search" or playing of the tape was illegal, as the defendant would have us do, the tape would be excluded from evidence under the exclusionary rule. *Mapp v. Ohio,* 367 U.S. at 655 (which made the exclusionary rule binding upon the states); *see also Hoyer v. State,* 180 Wis. 407, 417–418, 193 N.W. 89 (1923). But following *Nix v. Williams,* 467 U.S. 431 (1984), if it can be shown by a preponderance of the

evidence that the tape would have inevitably been discovered absent any constitutional violation, the tape may be admitted into evidence. *See also State v. Kennedy*, 134 Wis. 2d 308, 318, 396 N.W.2d 765 (Ct. App. 1986).

When Chief Moore interviewed Emily Weber on September 7, 1988, he asked her if she ever listened to the tape that was in the cassette player of the car. She responded that she had not. But she did reveal that the defendant had mentioned a tape to her on and off and that on the night of the assault, she thought the tape had something to do with the "surprise," but that the defendant would not let her listen to the tape when she tried to play it.

Although the interview with Emily did not reveal the tape's connection with the murder of Carla Lenz, it revealed the tape's connection with the attempted murder and assault of Emily. With this knowledge, the police would inevitably have obtained a warrant to play the tape in an attempt to find out why the defendant was keeping the tape a "secret" during the night of the assault, after he had been talking about it, on and off, to Emily. The contents of the tape, revealing the recitation of Carla's murder and his intent to do the same thing to Emily, would then have inevitably been discovered.

It may be argued that had the tape not been found in the first place, Chief Moore would never have asked Emily about a "tape." But Chief Moore's question was not "tainted" with his knowledge of the contents of the tape. He merely asked if Emily had listened to the tape that was in the cassette player of the car. She said no, and then freely volunteered all the information she knew about the tape, linking it to the defendant's "surprise." After this, the lawful "search" of the tape was inevitable. Even assuming that the tape was unlawfully played in

141

the first instance (which we do not), that should not be grounds to suppress the tape once the doctrine of inevitable discovery is applied. As the Court stated in *Nix*, "[e]xclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Nix*, 467 U.S. at 444.

For this reason, even if the "search" or playing of the tape was unconstitutional, it may be admitted under the inevitable discovery doctrine.

IV.

Whether the playing of the tape without probable cause or a warrant constitutes an unreasonable search depends on whether the defendant had a legitimate expectation of privacy in the tape in the first place. *State v. Rewolinski*, 159 Wis. 2d 1, 12, 464 N.W.2d 401 (1990).

> The determination of whether the defendant had a reasonable expectation of privacy depends on two separate questions. The first question is whether the individual by his conduct exhibited an actual, subjective expectation of privacy. The second question is whether such an expectation is legitimate or justifiable in that it is one that society is willing to recognize as reasonable.

*Id.* at 13. The defendant bears the burden of proof on both questions. *Id.* at 16. The standard of proof is a preponderance of the evidence. *Id.*

First, the defendant's conduct must have exhibited an actual, subjective expectation of privacy in the tape. The tape was in the cassette player at the time of the

assault on Emily Weber and when the police arrested the defendant and searched his car. The record does not reveal that the tape remained in the cassette player for the two day lapse between the assault and the search. Nonetheless, on the day the defendant was arrested, the tape was located in the cassette player, in the defendant's unlocked car, which was in the hospital parking lot. The defendant did not have the tape in its case, nor was the tape left in an area where there was no way of playing it. Quite the opposite is true. Not only was the tape left in a car which contained a cassette player, where it could easily be played, the defendant made it much easier for someone to play the tape by leaving it in the cassette player itself. We are of the opinion that had the defendant tried to exhibit an actual, subjective expectation of privacy, he surely would not have left the tape in the cassette player where anyone who would be riding in the car with the defendant the day he was arrested would merely have to push the tape in, and it would start to play.

Not only did the defendant's conduct not exhibit "an actual, subjective expectation of privacy" but we also conclude that even if he did, in view of the open, accessibility of the tape to anyone in the vehicle, in this case the police officer, such an exception is one "society" would not be "willing to recognize as reasonable." We conclude therefore, that the playing of the tape, found in the cassette player of the defendant's unlocked car, did not amount to a "search" of the tape, since he had no reasonable expectation of privacy in the tape in the first place.

We therefore hold that the playing of the unmarked audio cassette tape, found in the defendant's car during the execution of the search warrant for a knife and items

of clothing, was reasonable under the inventory search exception to the warrant requirement. Additionally, had the police not played the tape during the execution of the search warrant, they would have inevitably discovered it anyway after Emily Weber told Chief Moore that she thought the tape had something to do with the "surprise," but the defendant, after mentioning the tape, would not let her play it. Finally, we conclude that the playing of the tape can be sustained on the grounds that the defendant had no reasonable expectation of privacy in a tape, which was in a cassette player, in an unlocked car, which was found in a hospital parking lot; playing the tape, therefore did not constitute a "search" under the fourth amendment. For these reasons we sustain the judgment of conviction of the circuit court against the defendant on all eighteen counts.[7]

---

[7]In response to Justice Abrahamson's dissent, we first address the use of the three separate bases in concluding that the playing of the tape did not constitute an unreasonable search. We have before us an issue concerning the application of the fourth amendment. Our analysis of this constitutional issue does not turn on what the lower courts did or did not rely on. We review the question independently. *See generally, Farrell v. John Deere Co.,* 151 Wis. 2d 45, 62, 443 N.W.2d 50 (Ct. App. 1989). Moreover, we are not bound by the authorities on which the parties relied. "In the day-to-day operation of appellate courts . . . the courts regularly and frequently consider *sua sponte* authorities not cited and grounds of decision not raised. Tate, *Sua Sponte Consideration on Appeal,* 9 Trial Judges Journal 68 (1970) (cited with approval in D. Walther, P. Grove, M. Heffernan, *Appellate Practice and Procedure in Wisconsin,* App. D–29 (1986)). The use of mathematics is not necessary to decide the outcome of this case. Each basis alone acts as a sufficient rationale in admitting the tape into evidence over the defendant's fourth amendment objections.

Second, as the dissent correctly notes, the police were con-

*By the Court.*—The decision of the court of appeals is reversed and the judgment of conviction by the circuit court on all eighteen counts is reinstated.

WILLIAM A. BABLITCH, J. (concurring). I agree with the majority that the playing of the tape was reasonable under the inventory exception to the warrant requirement. Majority op. at 137. This was an inadvertent discovery during the course of what the record clearly reveals was an inventory search. The dissent erroneously asserts that "the record is clear that the law

ducting "a search for specific items named in the search warrant." (Dissent op. at 148.) But according to our reading of the record, the police also conducted an inventory of *the entire contents of the car* by going through the car "inch by inch" and removing "all the items that were in the car and log[ging] and document[ing] all the items that were in the car." Such a procedure is not uncommon when a vehicle is impounded, as the defendant's car was. *See McDougal,* 68 Wis. 2d at 413. Additionally, while the fifth circuit in *United States v. Turk,* 526 F.2d 654, 666 (1976) concluded that the playing of a tape as a valid inventory procedure was "disingenuous," the defendant in *Turk* had told the police officers that nothing was on the tape. *Id.* n.32. Chief Moore and his officers had no such information in the case before us.

Finally, the dissent's assertion that the defendant had a reasonable expectation of privacy in the tape because he "did not expose the contents of the tape to the public" has no basis in constitutional law. The defendant's reasonable expectation of privacy depends upon his conduct exhibiting his actual, subjective expectation of privacy, and whether society is willing to recognize that expectation as reasonable. *Rewolinski,* 159 Wis. 2d at 13, 464 N.W.2d 401. The expectation of privacy must be based on the totality of the circumstances. *Id.* at 13 and Abrahamson, J., dissenting op. at 36. Considering *all* of the circumstances as we do (majority op. at 142, 143,) and what society is willing to recognize as reasonable, the defendant had no reasonable expectation of privacy in the tape, exposed in a tape deck in an unlocked car.

enforcement officers were conducting not an inventory search but a search for specific items named in the search warrant." *Id.* Dissenting op. at 148 (Abrahamson, J., dissenting). Contrary to the dissent's assertion, the record establishes that the officers were removing all items from Weber's vehicle and logging each of them for inventory purposes on the warrant return.

SHIRLEY S. ABRAHAMSON, J. (dissenting). I agree with the unanimous decision of the court of appeals in this case that the tape must be suppressed. The tape was taken in violation of the defendant's constitutional rights under the fourth amendment. Accordingly, I dissent.

As the court of appeals forthrightly stated, this suppression case is very difficult because the illegally seized tape contains the defendant's voice confessing to the heinous crimes so graphically expounded upon in the majority opinion.

The law is clear, however, that an illegal search and seizure cannot be justified on the basis of the information the law enforcement officers discover during that search. The fourth amendment does not allow for hindsight. The law enforcement officers' knowledge before the search and seizure takes place, not after, determines the validity of the search and seizure.

Furthermore, a court cannot validate an illegal, unconstitutional search just because the illegal evidence tends to prove a defendant is guilty of a horrible crime. "Bad men, like good men, are entitled to be tried and sentenced in accordance with law . . .." *Green v. United States,* 365 U.S. 301, 309-10 (1961) (Black, J. dissenting).

These principles are so much a part of fourth amendment jurisprudence that restating them should

not be necessary. But judges need to keep fourth amendment principles firmly in mind as they grapple with the multitude of anomalous judge-made rules that have evolved from the words of the fourth amendment.[1] As the country celebrates the bicentennial of the ratification of the Bill of Rights in 1991, judges, lawyers and the public must keep sight of, and continually remind each other of, the fundamental precepts of our civil liberties.

The majority opinion justifies law enforcement officers' listening to the tape recording on three separate, independent grounds: (1) the automobile inventory exception to the warrant requirement; (2) the inevitable discovery rule; and (3) the defendant's having no legitimate expectation of privacy in the tape. If any one of these grounds were sound, it alone would justify an affirmance of the convictions. The state was aware of each of these grounds but did not argue any of them in this court. Why not? Because, in my opinion and apparently in the state's opinion, none of them is cogent. Combining the three grounds does not strengthen any of them. To paraphrase Justice Robert Hansen, zero plus zero plus zero equal zero.[2]

## I.

The majority's first justification for the search of the tape is the automobile inventory exception to the

[1]*California v. Acevedo,* — U.S. —, 111 S. Ct. 1982, 114 L.Ed. 2d 619 (1991) (Scalia, J., concurring).

[2]*Mentek v. State,* 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976).

Commentary critical of courts for lack of candor about the law and the facts is growing. *See, e.g.,* Kircher, *Judicial Candor: Do As We Say, Not As We Do,* 73 Marq. L. Rev. 421 (1990); D'Amato, *Aspects of Deconstruction: Refuting Indeterminacy with the Bold Thought,* 85 Nw. U.L. Rev. 113 (1990).

warrant requirement. The circuit court justified the search on this ground. The state apparently did not make this argument in the circuit court. The state expressly refused to adopt this rationale on appeal in the court of appeals.[3]

Listening to the tape does not fit within the automobile inventory exception to the warrant requirement. First, the record is clear that the law enforcement officers were conducting not an inventory search but a search for specific items named in the search warrant. The tape was in the car's tape player; it was not part of the clutter that had to be moved to find the specified items.

Second, no justification exists for the officers' listening to the tape even in conducting a valid inventory. None of the valid objectives of an inventory search requires the police to play a tape as part of an inventory search.[4]

The United States Supreme Court in *South Dakota v. Opperman,* 428 U.S. 364, 369 (1976), and the majority opinion suggest that an inventory of an impounded vehicle is a "caretaking procedure" to protect the car owner from loss, the police or other custodian from liability, and the police from potential danger. The circuit court's and this court's conclusion that the law enforcement officers listened to the tape in order to describe the tape

---

[3]According to the state's brief in the court of appeals:

"The defendant has raised serious questions about whether the plain view doctrine or the inventory rationale can legitimately be invoked to justify the playing of the tape. It is not necessary to resolve those questions, however, because the state does not intend on this appeal to attempt to justify the playing of the tape under either of those two theories." State's Brief, Court of Appeals, pp. 2–3.

[4]See 3 LaFave, *Search and Seizure,* sec. 7.4(a), p. 116 (2d ed. 1987).

with particularity to fulfill the objectives of inventory searches is contradicted by the fact that the officer inventoried the tape as "Item 39 AS—One unmarked cassette tape." The officers could have used this same general description without listening to the tape.[5]

The fifth circuit court of appeals characterized as "at the least, disingenuous," the federal government's contention that a tape was played as part of an inventory. *United States v. Turk,* 526 F.2d 654, 666 (5th Cir. 1976).

Third and finally, even if the police were conducting an inventory search in this case, the state has never asserted or proved, as the United States Supreme Court cases require, that the tape was seized or played pursuant to standardized department procedures governing inventory searches.[6] The circuit court recognized that no

---

[5]A general description of items was used a number of times in the "inventory" in this case. The officers listed several items very generally: "Item 48 AS—Numerous pornographic magazines"; "Item 49 AS—Numerous pornographic magazines"; "Item 50 AS—Numerous pornographic magazines and one blue paper with 'list of items.' One Marquip pay stub."

[6]*Florida v. Wells,* — U.S. —, 110 S. Ct. 1632 (1990) (absent any policy of the Highway Patrol about opening a closed container, opening container during inventory search violated fourth amendment); *Colorado v. Bertine,* 479 U.S. 367 (1987) (opening closed container found in vehicle during inventory search constitutional because policy mandated opening container); *Illinois v. Lafayette,* 462 U.S. 640 (1983) (police may search personal effects of person under arrest as part of routine administrative procedure); *South Dakota v. Opperman,* 428 U.S. 364 (1976) (police may search vehicle impounded for parking violations pursuant to routine inventory procedures); *State v. Axelson,* 149 Wis. 2d 339, 347, 441 N.W.2d 259 (Ct. App. 1989) (inventories pursuant to standard police procedures are reasonable); 3 LaFave, *Search and Seizure,* sec. 7.4(a), p. 110 (2d ed.

well established policy of the police department had been proved but concluded that this factor was irrelevant because the inventory search in this case was conducted under exigent circumstances which the circuit court did not describe.

## II.

The majority's second justification for the search relies on the doctrine of inevitable discovery. The circuit court rejected the state's argument on inevitable discovery, and the state did not pursue this argument on appeal in the court of appeals. See *State v. Weber,* No. 90–0181–CR unpublished slip op. at 5, n.1.

The record refutes the majority's conclusion that the police would have independently discovered the tape. The defendant's wife did not mention the tape to the police until Captain Moore—who, of course, had already heard the tape—questioned her about it. The majority opinion concedes that prior to listening to the tape the police had no idea that the tape could be evidence. Majority op. at 140. Under these circumstances, the majority opinion's assertion, at 141, that Captain Moore's pointed questioning of the defendant's wife about the tape was not tainted with his knowledge of its contents is implausible.

## III.

The majority opinion's third and final justification is that the defendant had no legitimate expectation of

1987) ("Inventories should not be upheld under *Opperman* unless the government shows that there exists an established reasonable procedure for safeguarding impounded vehicles and their contents and that the challenged police activity was essentially in conformance with that procedure").

privacy in regard to the tape and therefore no constitutional violation occurred.

The law is clear that an individual has a reasonable expectation of privacy in items in his or her car. This expectation of privacy may be diminished due to the mobility of an automobile[7] and pervasive governmental regulation of automobiles[8] and may be lost if the individual exposes items in a car to public view.[9] While the tape itself may have been visible to someone looking into the car, its contents were not audible. To determine the contents of the tape, the police had to play the tape. Because the defendant did not expose the contents of the tape to the public, I conclude that the defendant had a reasonable expectation of privacy in the contents of the tape.[10]

Judges are under oath to support the Constitution of the United States, even when the Constitution appears to protect the most repugnant of criminals. I join the court of appeals in concluding that the search was illegal. For the reasons set forth, I dissent. The case should be remanded for a new trial.

[7]*California v. Carney*, 471 U.S. 386, 390–91 (1985).

[8]*South Dakota v. Opperman*, 428 U.S. 364, 368 (1976).

[9]*Coolidge v. New Hampshire*, 403 U.S. 443 (1971). *See* 3 LaFave, *Search and Seizure*, sec. 7.5, p. 125 (2d ed. 1987).

[10]Moreover, police may seize only objects in plain view in an automobile when it is "immediately apparent to the police that they have evidence before them." *Coolidge*, 403 U.S. at 466. As the majority acknowledges, the police did not have probable cause to listen to the tape.