John R. WEBER, Petitioner–Appellant,

v.

James P. MURPHY, Respondent–
Appellee.

No. 93–1191.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1993.

Decided Feb. 2, 1994.

Charles B. Vetzner (argued), Office of the State Public Defender, Madison, WI, for petitioner-appellant.

David J. Becker, Asst. Atty. Gen. (argued), Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for respondent-appellee.

Before FLAUM, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The petitioner, John Weber, induced his wife, Emily Weber, to take a ride with him in the Wisconsin countryside, telling her that he had a "surprise" for her.[1] After a short

---

1. Most of the relevant facts set forth here in introduction are taken from the Wisconsin Supreme Court's opinion. *See State v. Weber,* 163 Wis.2d 116, 471 N.W.2d 187 (1991).

drive, the petitioner stopped the car at his parent's vacant farm property. He told Emily to look out the window, which she did. He then held a knife to her throat, taped her eyes and mouth shut, taped her hands behind her back, beat her with his fists and a metal shovel, cut her breast and legs with a knife, burned her with a lighted cigar on the body and in her vagina, and repeatedly sexually assaulted her with a wheelbarrow handle. Emily lapsed into unconsciousness. Early the next morning, the petitioner drove Emily home. He ordered her to tell a fabricated story if she was questioned about her injuries. He then attempted to wash Emily in the bathtub and to treat her injuries. He soon realized that Emily needed medical attention, so he called Emily's mother who took her to a hospital, where she was admitted to the intensive care unit.

The next evening, the petitioner stopped at the Phillips, Wisconsin police department to give the police the details of the assault that he claimed Emily had described to him. He told them that three strangers had attacked her. The following day, Phillips Police Chief Craig Moore went to the hospital to interview Emily. She also told him that she had been attacked by three strangers. Chief Moore interviewed Emily again later the same day. This time, she told him that it was her husband who had attacked her and described the assault in detail including a description of his car, the wooded area where she was taken, and the clothing that she wore on the night of the attack. The petitioner, who was at the hospital during Emily's statement, was placed under arrest. The keys to his unlocked car were confiscated, and the car was moved by wrecker service to the Price County Sheriff's Department.

The police then obtained warrants authorizing a search of petitioner's car and house. The warrants listed various items of clothing and the knife used to threaten her. Because the car was a mess and filled with so much debris, the police decided to remove all items found and to inventory them on a separate

log sheet.[2] The car was emptied beginning with the front seat of the driver's side, followed by the front seat of the passenger's side. At some point in time during this process, an officer came across an unmarked audio cassette tape located in the car's tape player. The officer alerted Chief Moore, who turned the ignition key to the accessory position, and pushed the cassette tape into the player causing it to begin playing. He immediately recognized the petitioner's voice, addressing Emily and describing a series of brutal and hideous acts of torture he claimed to have committed against Carla Lenz, Emily's sister. Carla had disappeared from the area two years earlier.

Chief Moore listened to the entire tape and subsequently had the petitioner removed from his jail cell for interrogation. When Moore questioned him concerning Carla's death, he denied any involvement. However, after Moore informed the petitioner that he had listened to the cassette tape, the petitioner drew Moore a map which showed where the body of Carla Lenz was buried. By following the map, the police were able to locate Carla's remains.

### Procedural History

The petitioner was charged with a variety of counts relating to both Emily and Carla including attempted murder as to Emily and the murder of Carla. Prior to trial, the petitioner filed a "motion to quash search warrant," and sought to suppress all physical evidence seized as a result of the search of his car. Specifically, the petitioner requested suppression of the cassette tape. Following a hearing, the state trial judge orally denied the motion and refused to suppress the cassette and its audio contents, finding that the tape was properly played during the execution of the search warrant under the plain view doctrine[3] and the inventory search[4] exception to the warrant requirement. The trial court judge also indicated that the cassette tape could not properly be

2. The return of the search warrant was accompanied by the inventory of all items seized.

3. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

4. *See Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).

693

admitted into evidence under the inevitable discovery doctrine.[5]

The petitioner pled guilty to some counts relating to his wife and some counts relating to his sister-in-law. He went to trial on the remaining counts. At the guilt phase of the trial, the state introduced an edited version of the cassette tape into evidence.[6] The petitioner was found guilty on all counts submitted for trial. Based on the convictions on all eighteen counts charged, the trial court sentenced the petitioner to life plus 164 years and nine months imprisonment.

The petitioner directly appealed his convictions to the Wisconsin Court of Appeals, requesting that he be granted a new trial on the nine counts to which he pled guilty and on the nine counts on which he was found guilty by the jury. The sole issue raised in his initial appeal was the constitutional validity of the playing of the cassette tape during the execution of the search warrant.

Before the Wisconsin Court of Appeals, the petitioner argued extensively that the audio tape was not admissible into evidence because the so-called "plain view" doctrine did not authorize the police to play the cassette tape incident to the search. The petitioner also claimed that the audio contents of the cassette tape were inadmissible because the playing of the tape incident to the search was not authorized by application of the inventory search exception to the warrant requirement. The State of Wisconsin responded by conceding that the petitioner had "raised serious questions about whether the plain view doctrine or the inventory search rationale [could] ... legitimately be invoked to justify the playing of the tape." However, the state argued that the tape was played as a "legitimate part of a probable cause search" of the petitioner's car.

In an unpublished opinion, the Wisconsin Court of Appeals noted that the state had conceded that the rationale used by the trial court to uphold playing of the cassette tape during the search were not valid. However,

in addition, the court also specifically stated why neither the "plain view" doctrine, nor the inventory search exception, constituted a legitimate basis for playing the cassette tape during the search. Moreover, the state appeals court found that the police lacked probable cause to believe the cassette itself contained evidence of the crime and thus it could not legally be played as part of a probable cause search of an automobile. The state appeals court reversed the petitioner's convictions on the charges relating to Carla. The petitioner's convictions with respect to Emily were determined by the appellate court not to be a part of the case before it on appeal.

The state sought review of the court of appeals decision in the Wisconsin Supreme Court. That court held that the cassette tape was properly admitted into evidence against the petitioner based on: (1) the inventory search exception to the warrant requirement, (2) the inevitable discovery doctrine, (3) its belief that the petitioner lacked a legitimate expectation of privacy[7] in the cassette tape. State v. Weber, 471 N.W.2d at 193–199. Consequently, the Wisconsin Supreme Court reversed the intermediate state appeals court and reinstated the trial court's judgment of conviction on all eighteen counts.

The petitioner then filed this petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in federal district court. The district court determined that it could not reach the merits of the petitioner's claim because under Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), federal courts may only entertain Fourth Amendment challenges on habeas corpus review if the petitioner has not been afforded a full and fair opportunity to litigate his claim in state court. In so ruling, it held that the petitioner was not denied such an opportunity in his state proceedings even though the Wisconsin Supreme Court upheld the playing of the cassette tape during the execution of the search warrant on grounds not discussed by

---

**5.** See Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

**6.** The unedited audio tape was played to the jury during the insanity phase of the trial. The intro-

duction of the tape at that phase is not an issue in this case.

**7.** See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

either party in their supreme court briefs or at oral argument.

## Discussion

■ The only issue presented for our review is whether the petitioner was afforded an opportunity for full and fair litigation of his Fourth Amendment claim in the state court proceedings. If so, we must deny his petition under the doctrine announced in *Stone v. Powell.* In that case, the Supreme Court held that where the state has provided such an opportunity, "a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. at 3052. This decision was based on the Court's belief that the incremental benefits associated with applying the exclusionary rule on collateral review was outweighed by its costs. *Id.* at 493, 96 S.Ct. at 3052.

■ The Supreme Court did not define the phrase "opportunity for full and fair litigation"; however, we have held that the petitioner has been provided that opportunity when: (1) he has "clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of . . . [his] fourth amendment rights and (2) the state court has carefully and thoroughly analyzed the facts and [ (3) ] applied the proper constitutional case law to the facts." *Pierson v. O'Leary,* 959 F.2d 1385, 1391 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992) (citing *Dortch v. O'Leary,* 863 F.2d 1337, 1342 (7th Cir.1988), *cert. denied,* 490 U.S. 1049, 109 S.Ct. 1961, 104 L.Ed.2d 429 (1989)).

We first address the question of whether the petitioner was afforded an opportunity to inform the state court of the factual basis of his claim. The trial court conducted an extensive suppression hearing, during which both the petitioner and the state were given the opportunity to present evidence concerning the playing of the cassette tape during the police search. There were no limitations placed on the petitioner's ability to present evidence that the audio contents of the tape were illegally obtained. Additionally, he not only had the opportunity, but actually took advantage of that opportunity by arguing that he was denied his Fourth Amendment rights. Under these circumstances, we cannot say that the petitioner was denied the opportunity to inform the state trial court of the factual basis of his claim or to argue that those facts constituted a denial of his Fourth Amendment right to be free from an unlawful search.

Next, we must decide whether the facts were "carefully and thoroughly" analyzed in the state court proceedings. The petitioner argues that the trial court made factual determinations that are not fairly supported by the record and that the Wisconsin Supreme Court incorporated some of the trial court's faulty factual determinations in its opinion. Thus, the petitioner argues, the state court failed to "carefully and fully analyze the facts." In support of his position, the petitioner refers us to the Eighth Circuit case of *Howard v. Pung,* 862 F.2d 1348, 1350 (8th Cir.1988), *cert. denied,* 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989), which comments that "a state court evidentiary hearing may be less than full and fair if it yields factual determinations not fairly supported by the record as a whole." (citations omitted). Without citing to any relevant case law, the respondent argues in favor of a contrary position:

> The supreme court's decision reveals that it carefully and thoroughly reviewed the testimony given at the suppression hearing in the state trial court and drew the factual conclusions that it believed that the testimony warranted. Even if this court were to review the record and find those factual conclusions faulty, that would provide no grounds for finding *Stone v. Powell* inapplicable here. It is precisely that—review of a state court decision to determine whether it is faulty—that *Stone v. Powell* forbids.

We reject the respondent's position because we cannot say that a state court has "carefully and fully analyze[d]" the facts of a Fourth Amendment claim if its factual findings are not fairly supported by the record. We stress, however, that a state court's factual determinations are due a "high measure of deference," *Sumner v. Mata,* 455 U.S. 591,

598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982), and are presumed correct. 28 U.S.C. § 2254(d).

The petitioner first challenges the trial court's finding that the cassette tape was discovered during the removal of other items from the car. He contends that the evidence is uncontroverted that the tape was actually discovered after the formal search had ended. Even if we were to agree with the petitioner that the trial court made an erroneous factual finding on the timing of the discovery, we cannot agree that it had any impact on the court's ruling. When the tape was found is irrelevant. The search conducted by the police, pursuant to the execution of the warrant, included those acts necessary to prepare any inventory listing all items discovered in the car. A search is officially concluded only when any inventory conducted has been completed.

The petitioner secondly contends that there is no evidence in the record to support the trial court's finding that the unmarked cassette tape was played to learn its contents, so that it could be properly inventoried. However, the petitioner did not make this argument to the district court and therefore we must consider it waived. *See Zbaraz v. Hartigan,* 763 F.2d 1532, 1544 (7th Cir. 1985), *aff'd* 484 U.S. 171, 108 S.Ct. 479, 98 L.Ed.2d 478 (1987).

Consequently, we find that the petitioner has failed to show that any of the trial court's material factual findings are not fairly supported by the record.

The petitioner also argues that the supreme court's decision to uphold playing of the cassette tape on grounds that had not been briefed or orally argued to that court denied him the opportunity to fully and fairly litigate his Fourth Amendment claim.[8] The state supreme court upheld playing of the tape during the execution of the search warrant on three grounds: (1) the petitioner lacked a legitimate expectation of privacy in the tape; (2) the tape was played as part of a valid inventory search; (3) the tape would have inevitably been discovered.

The petitioner notes that during oral argument before the Wisconsin Supreme Court, counsel for the respondent was asked whether he believed that the petitioner had a legitimate expectation of privacy in the cassette tape. He responded by saying "you can analyze it from two perspectives. I think the better one is to say yes, there was some minimal expectation of privacy that still remained in the tape and that we have to show some justification for its playing." The petitioner also points out that the inevitable discovery rationale was specifically rejected by the trial court and was not advanced by the state in either the court of appeals or the supreme court. Finally, the petitioner notes that the state abandoned the inventory search rationale in its state appeals court brief and did not raise it before the Wisconsin Supreme Court.

The petitioner contends that what transpired in the Wisconsin Supreme Court is similar to what happened in *Bailey v. Duckworth,* 699 F.2d 424 (7th Cir.1983), where we held that the petitioner was denied a full and fair opportunity to litigate his Fourth Amendment claim in the Indiana courts. In that case, Frank Bailey and his brother Hank Bailey, filed a motion to suppress evidence seized from Hank's home, contending that the search warrant was not supported by probable cause. The motion was denied and the Baileys were convicted. The defendants then filed a post-trial Motion to Correct Errors, again arguing that the search warrant had been issued without probable cause and that the evidence should have been suppressed. In response, the state argued, in part, that Frank did not have standing to challenge the warrant. The state trial judge denied the defendant's post-trial motion without discussing the standing issue.

On appeal, initially the Indiana Court of Appeals reversed the convictions, holding that the evidence upon which the convictions were based had been seized in violation of the Fourth Amendment. The state then petitioned for rehearing, arguing for the first time in the appellate court that Frank lacked standing to object to the search of his broth-

---

**8.** We note that the petitioner's argument does not fit neatly into the test announced in *Pierson.* However, it is based on a valid Seventh Circuit case as discussed in detail.

er's home. The court granted the state's petition as to Frank and reinstated his conviction. Frank then filed a habeas petition in the district court. The district court denied his petition.

On review, we held that Frank Bailey was denied a full and fair opportunity to litigate his Fourth Amendment claim within the meaning of *Stone v. Powell.* We based our decision on the fact that: (1) "the standing issue was not raised in the trial court, except in conjunction with a post-trial motion;" (2) "the standing issue was not briefed or orally argued in the initial appeal;" (3) the petitioner's opportunity to address the standing issue in response to the state's petition for rehearing was not sufficient. *Id.* at 425.

Despite the petitioner's contention, *Bailey* is readily distinguishable from what transpired here. First, as the district court correctly noted, *Bailey* involved two separate issues, a Fourth Amendment issue and a standing issue. Here, however, the only issue in contention at every stage of the state litigation was the constitutionality of playing the cassette tape during the search. Also, the petitioner raised the Fourth Amendment issue in the state trial court and argued his position in both the state court of appeals and the state supreme court.

Moreover, the petitioner specifically argued in both of the Wisconsin appellate tribunals that no valid inventory search occurred.[9] In fact, he devoted over four pages of his brief in the Wisconsin Court of Appeals to this argument and his appeals court brief was before the Wisconsin Supreme Court when it decided this case.[10] Thus, unlike the situation in *Bailey,* the Fourth Amendment issue in general, and the inventory search rationale in particular, was raised in the trial court, and was briefed in both the initial appeal and on discretionary review.

Under these circumstances, the decision making process in the Wisconsin Supreme

Court did not deny the petitioner a full and fair opportunity to raise his Fourth Amendment claim.

Finally, we look to see whether the state court applied the proper constitutional case law to the facts. The petitioner argues that the Wisconsin Supreme Court failed to follow the 1967 case of *Katz v. United States,* in resolving the reasonable expectation of privacy issue. In fact, however, the Wisconsin high court applied the proper "expectation of privacy" test developed by the United States Supreme Court in 1979 in the case of *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). *See State v. Weber,* 471 N.W.2d at 198.

The petitioner also argues that the Wisconsin Supreme Court failed to adhere to the requirement of *Nix v. Williams* that the state show inevitable discovery by a preponderance of the evidence. But the Wisconsin Supreme Court explicitly held in its opinion that the state had the burden of showing by a preponderance of the evidence that the tape would have been inevitably discovered. *State v. Weber,* 471 N.W.2d at 197.

Next, the petitioner contends that the Wisconsin Supreme Court failed to apply *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987), which states that an inventory search cannot be valid if it is motivated by a desire to investigate suspected criminal activity. However, again, the Wisconsin Supreme Court's opinion explicitly states that "[t]he record is void of any showing that the police were acting for the purpose of investigation." *State v. Weber,* 471 N.W.2d at 195.

Consequently, the petitioner has failed to show that the Wisconsin Supreme Court did not apply the proper constitutional law to the facts of his Fourth Amendment claim.

### Conclusion

Because we conclude that the petitioner had a full and fair opportunity to litigate his

9. We focus on the inventory search rationale, noting that if properly applied, it is independently sufficient to uphold playing of the cassette tape on Fourth Amendment grounds.

10. During oral argument, Justice Day, author of the Supreme Court's majority opinion asked the

petitioner's attorney a question which indicated that he had read the petitioner's Court of Appeals brief. Also, Justice Abrahamson's dissenting opinion quoted a portion of the state's court of appeals brief. *State v. Weber,* 471 N.W.2d at 200 n. 3 (Abrahamson J., dissenting).

Fourth Amendment claim in the state court proceedings, we AFFIRM the decision of the district court.