132 F.3d 36
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Ricardo GLOVER, Petitioner-Appellant,
v.
Gary R. MCCAUGHTRY, Warden, Waupun Correctional Institution,
Respondent-Appellee.
 No. 95-2304.
 United States Court of Appeals, Seventh Circuit.
 Submitted July 30, 1997
Decided Nov. 25, 1997.[1]
Rehearing Denied Jan. 12, 1998.
 
 Appeal from the United States District Court for the Eastern District of Wisconsin, No. 95 C 425; J.P. Stadtmueller, Chief Judge.
 Before RIPPLE, ROVNER and EVANS, Circuit Judges.
 
 ORDER
 
 1
 * INTRODUCTION
 
 
 2
 Petitioner Ricardo Glover, a Wisconsin state prisoner, filed a pro se petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, which the district court denied, finding no merit to any of the claims. On appeal, Glover contends that the district court erred in finding that his Fourth Amendment rights were not violated when police officers stopped the vehicle in which he was riding and then arrested him and erred in finding that his confession was not coerced. He also contends, in the reply brief, that the state court had no subject matter jurisdiction to hear his case.[2] We affirm.
 
 II
 PROCEDURAL HISTORY
 
 3
 Glover was charged with first-degree sexual assault, false imprisonment with a dangerous weapon and attempted first-degree intentional homicide. In February 1990, a jury trial commenced. However, after the government closed its case in chief, Glover entered a plea of guilty to first-degree sexual assault and false imprisonment with a dangerous weapon, and a plea of no contest to the charge of attempted first-degree intentional homicide. A judgment of conviction was entered on February 22, 1990, and Glover was sentenced to 45 years' imprisonment.
 
 
 4
 On March 18, 1992, the Wisconsin Court of Appeals affirmed the conviction. State v. Glover, No. 91-0952-CR, 1992 WL 125185 (Wis Ct.App. Mar. 18, 1992). The Wisconsin Supreme Court denied review. State v. Glover, 490 N.W.2d 25 (Wis.1992). Glover also filed a state petition for a writ of habeas corpus in the Wisconsin Court of Appeals. The state appellate court struck the petition for non-compliance with Wisconsin's appellate rules.
 
 
 5
 On April 21, 1995, Glover filed a federal petition for habeas corpus, 28 U.S.C. § 2254, challenging the Wisconsin convictions, and raising eleven specific claims.[3] The district court dismissed the petition after concluding that none of the alleged grounds had merit. The court also held that Glover had exhausted his state remedies and had not defaulted on his claims.
 
 III
 DISCUSSION
 
 6
 Glover filed his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Under the holding in Lindh v. Murphy, 117 S.Ct. 2059, 2068 (1997) ("the new provisions of chapter 153 generally apply only to cases filed after the Act became effective"), the amendments enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) do not apply to Glover's case because the petition was pending at the time of the new Act. We therefore rely on the pre-AEDPA habeas corpus standards.
 
 A. Factual Background
 
 7
 The facts, as stated by the Wisconsin Court of Appeals in the direct criminal appeal, are as follows:
 
 
 8
 The charges against Glover stemmed from criminal acts committed by him on May 29, 1989 against his eleven-year-old sister-in-law, S.B. Testimony at the hearing on Glover's motions to suppress evidence indicated that on that day at approximately 3:18 a.m., Racine police officer Francis Vitacco was dispatched to a Racine residence where he met S.B., who was soaking wet and being cared for by the occupants of the residence. These residents told Vitacco that S.B. had been wet when she came to their door and that her hands had been tied behind her back. S.B. told Vitacco that her brother-in-law, Glover, had tied her hands together and thrown her from a bridge into a nearby river. S.B. told police that before throwing her into the river, Glover had sexually molested her at knifepoint. Vitacco also discovered wet, child-sized footprints leading from the river.
 
 
 9
 Vitacco subsequently took S.B. to a hospital. S.B. provided police with Glover's name, his physical description, a description of what he was wearing, and a description of the vehicle he was driving at the time of the offenses, including its license number. At approximately 6:00 a.m., Vitacco was advised by his sergeant as to Glover's possible location. Vitacco and another officer drove to the address and discovered the vehicle identified by S.B. parked in front. While the officers waited for backup assistance, the car began to move. Vitacco and his partner then stopped the vehicle and when they pulled it over observed three females in the front seat and a male matching S.B.'s description of Glover in the back seat. Vitacco then told Glover to step out of the vehicle and placed him under arrest. The car was immediately searched, leading to the seizure of a knife which was lying on the console by the shifting lever.
 
 
 10
 Glover, 1992 WL 125185, at * * * 1 (emphasis added).
 
 
 11
 In a federal habeas corpus proceeding, a state court's findings of fact are presumed correct. 28 U.S.C. § 2254(d). Glover disputes the italicized portion of the state appellate court's statement of facts and insists that, at the time the police first interviewed the victim, she had only accused Glover of pushing her off a bridge, an argument which we discuss further below. In any event, Glover concedes that "the facts surrounding [his] arrest are not disputed and, therefore, all that is presented here is the question of law as to whether those facts constituted a reasonable suspicion to stop [his] vehicle and whether there was probable cause to arrest him at the point he was arrested." Appellant's Br. at 10.
 
 B. Fourth Amendment Claims
 
 12
 Glover argues that the trial court should have suppressed all evidence stemming from the stop of the automobile because the police did not have the necessary articulated and reasonable suspicion of wrongdoing. See United States v. Hensley, 469 U.S. 221, 229 (1985); Terry v. Ohio, 392 U.S. 1 (1968). Glover also argues that, even if the vehicle stop was appropriate, the police still had no probable cause to arrest him.
 
 
 13
 Under Stone v. Powell, 428 U.S. 465, 494 (1976), we cannot consider these Fourth Amendment claims in a federal habeas corpus proceeding unless Glover was denied a full and fair opportunity to litigate his claims in state court. Initially, we reject Glover's argument that the government has waived the argument that Stone v. Powell bars any review of the Fourth Amendment claims because it failed to refer to the Stone holding in the district court. The government was never required to file an Answer to the federal habeas corpus petition, and therefore it had no opportunity to refer to Stone. Glover himself, however, waited until his reply brief[4] to argue that he had not received a full and fair opportunity to litigate his Fourth Amendment claims, which would generally result in a finding of waiver. See Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 508 n. 5 (7th Cir.1994). Giving Glover the benefit of the doubt, however, in view of language in the opening brief that might be construed as an attempt to raise the full and fair opportunity claim, we shall consider the merits of the Fourth Amendment claims.
 
 
 14
 We hold that, even if Glover did not have a full and fair opportunity to litigate the claims based on the state appellate court's incorrect statement of facts presented at the suppression hearing, cf Turentine v. Miller, 80 F.3d 222, 224-26 (7th Cir.), cert. denied, 117 S.Ct. 394 (1996); Weber v. Murphy, 15 F.3d 691, 694 (7th Cir.), cert. denied, 511 U.S. 1097 (1994), the undisputed facts fully support a finding that the police had a reasonable and articulable suspicion to justify stopping the car in which Glover was riding, and had probable cause to arrest him.
 
 
 15
 Glover only offers a weak argument that the police had no reasonable suspicion to stop him. The victim knew Glover, her brother-in-law, and gave a fill physical description of him, of the clothes he was wearing at the time of the alleged offense, and of his vehicle. When the police located the vehicle described by the victim, they observed Glover sitting in the back seat; he matched the physical description the victim had given. The main thrust of the argument Glover presents, however, is that at the time he was stopped and arrested, the police had no reason to believe that anyone had committed a crime against the child. Glover argues that there was no testimony presented at the suppression hearing indicating that the police knew the victim had been sexually molested at knife point and then thrown into the river with her hands tied behind her. Glover's argument rests on the unlikely proposition that "one can imagine all sorts of circumstances where" pushing a child off a bridge into a river "would not amount to criminal behavior," for example, "one could accidentally push another off of a bridge." Appellant's Br. at 12-13. He maintains that the suppression hearing involved no testimony describing "what sort of bridge was involved" and thus it "could have been anything from a mile-long suspension bridge which runs 250 feet over the surface of the water, to a small wooden foot bridge running over a creek." Appellant's Br. at 12. He argues that the "ultimate legal question" is whether being "pushed off a bridge into water" is sufficient to warrant a belief that he "engaged in, or [was] about to engage in, criminal behavior." Appellant's Br. at 12.
 
 
 16
 The police reports, upon which the criminal complaint was based, expressly state that, prior to being brought to the hospital, the victim told the police that after sexually molesting her at knife point, Glover drove her to the bridge, tied her hands behind her back, and threw her into the river, a distance the police determined to be over 17 feet. Moreover, even the undisputed facts gave the police probable cause to arrest Glover. As Glover admits, the police knew that the victim claimed to have been pushed into the river in the middle of the night. Moreover, Glover concedes that the officer who first interviewed the victim was told that he was sent to investigate a complaint of attempted homicide and sexual assault. The police were called shortly after the victim was able to get out of the river, and they saw child-sized footprints, still wet, leading up the river bank and across the bridge.[5] The victim clearly identified Glover as the perpetrator. The police clearly had probable cause to believe a crime had been committed. We hold that the record fully supports the police officers' conduct in initially stopping the vehicle, and in giving them probable cause to arrest Glover.
 
 C. Voluntariness of Confession
 
 17
 Glover argues that the statements he made to the police following his arrest should have been suppressed because they were involuntary. He claims that the involuntariness resulted from the fact that either his signature on a form waiving his Miranda rights was forged, or he signed but did not understand what he was signing; that his request for an attorney was ignored; and various other factors, including "tactics" used by the police, and his fatigue, hunger, and intoxication at the time of questioning.
 
 
 18
 Proof of coercive police conduct can support a finding that a confession was not voluntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986). The ultimate issue of the voluntariness of a confession is a question of law which we review de novo. Thompson v. Keohane, 516 U.S. 99, 465-66 (1995); Miller v. Fenton, 474 U.S. 104, 115-17 (1985). Cf. Ornelas v. United States, 116 S.Ct. 1657, 1662 (1996); United States v. Brooks, 125 F.3d 484, 492 (7th Cir.1997); United States v. Mills, 122 F.3d 346, 348-49 (7th Cir.), petition for cert. filed, --- U.S.L.W. ----, (U.S. Nov. 5, 1997) (No. 97-6692); United States v. D.F., 115 F.3d 413, 419 (7th Cir.1997).
 
 1. Request for Attorney
 
 19
 Glover argues, in the context of the coerced confession claim, that the statements should have been suppressed because during the interrogation he asked for an attorney when he remarked to the police, "I have no attorney."
 
 
 20
 Hearings were held on Glover's motions to suppress, and the trial courts found that Glover had been properly advised of his right to counsel, and then waived that right. The Wisconsin Court of Appeals held that the evidence taken at the hearings was sufficient to support the trial court's finding that Glover was informed of his right to counsel prior to questioning, and that he voluntarily and knowingly waived the right to counsel.
 
 
 21
 We agree with the district court that the statement "I have no attorney" was "ambiguous at best," and that the police were not required to clarify, based on this statement alone, whether or not Glover was requesting an attorney. See Davis v. United States, 512 U.S. 452 (1994) (finding to be equivocal the petitioners statement, "Maybe I should talk to a lawyer", but held that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney"). We also note the contradiction between Glover's argument that "had he known he had the right to speak to an attorney" he would have done so instead of giving statements to the police, and his argument that he asked for but was denied an attorney.
 
 2. Claim of a Fabricated Miranda Form
 
 22
 Glover argues that the confession should have been suppressed because the form purportedly bearing his signature and stating that Miranda rights had been given and understood was falsified by the police.
 
 
 23
 We conclude that there is no basis upon which to disturb the state courts' credibility determinations that Glover was read his Miranda rights, and that the signature on the form verifying this reading was in fact Glover's. See Henderson v. DeTella, 97 F.3d 942, 948 (7th Cir.1996), cert. denied, 117 S.Ct. 1471 (1997). Moreover, we note that Glover's claim that the signature on the form was forged contradicts his statement that he did sign the form, but that, without his glasses, he could not read it. He states that he "was under the understanding that he was signing a form for his clothing to be taken, not a waiver of rights form." Habeas Corpus Pet. at 5-a.
 
 3. Coerced Confession: Other Factors
 
 24
 Glover also argues that his statements were coerced, for example, by the police telling him horrifying stories of "what they did to John Dillinger." In addition, he alleges that during the 3 1/2 hours of questioning, he was suffering from sleep deprivation; anxiety; hunger; a psychiatric disorder ("schizoid personality disorder"); intoxication; and poor vision; and that "he was a stutterer."
 
 
 25
 The state appellate court found that the evidence supported the trial courts'[6] findings that no improper or coercive police conduct occurred, when the questioning occurred over a period of only 3 1/2 hours, with periodic breaks, and the police officers testified that Glover seemed alert and gave coherent answers. The facts presented in this record strongly support the state courts' underlying factual determinations, and our de novo review leads us to conclude that no police coercion undermined the confession. The "horrifying story" about John Dillinger, if true, does not rise to the level of a due process violation. There is no evidence that the police knew, or should have known, of Glover's alleged psychiatric disorder. See Bae v. Peters, 950 F.2d 469, 475 (7th Cir.1991). Nor did Glover appear to be intoxicated immediately before, during, or after the interview. See United States v. Chrismon, 965 F.2d 1465, 1469 (7th Cir.1992). In fact, Glover claims only that he had consumed "large amounts of alcohol ... on the evening before the incident." The interview itself did not take place until 10:00 a.m. the next day; this interval further undermines his claim that he was still intoxicated at that time. In regard to Glover's repeated reliance on the fact that he stuttered, he points to nothing to indicate the import of stuttering; for example, he does not claim that the police misunderstood any portion of the statements he made. And, given the brief length of the mid-morning interview, Glover's complaint that he was "interrogated ... over the course of three hours with nothing to eat" can hardly point to police coercion.
 
 
 26
 Finally, Glover argues that the police were "attempting to wear [him] down." He points to the detectives' testimony that, during the interview, they were trying to get him to "change" his story, that they took breaks to "discuss [their] strategy," and that different detectives interviewed him. These are normal police interviewing procedures that simply do not rise to the level of coercion.
 
 
 27
 We conclude, viewing the totality of circumstances, that Glover's claim that his confession was involuntary and resulted from police coercion is without merit.
 
 D. State Court's Jurisdiction
 
 28
 Glover argues in his reply brief that the state court had no "subject matter jurisdiction" to hear his case because at the time that he first appeared before the court, no charges had been filed, and charges were not filed until the day after his arrest.[7] An argument raised for the first time in a reply brief is waived.[8] Wildlife Express Corp., 18 F.3d at 508 n 5; 7th Cir. R. 28(f). In any event, we find no violation of Glover's due process rights. See United States v. Smith, 80 F.3d 1188 (7th Cir.1996).
 
 Conclusion
 
 29
 For the reasons stated, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 After an examination of the briefs and the record, we have concluded that oral argument is unnecessary; accordingly, the appeal is submitted on the briefs and the record. See Fed. R.App. P. 34(a); Cir. R. 34(f)
 The record in this case was lost after it was logged with this court. The court ordered that the record be reconstituted. See Fed. R.App. P. 10. Both parties, through counsel, participated in the reconstruction of the record. Neither has objected to the state of the reconstituted record on which the case is now submitted to the panel.
 
 
 [2]
 The State of Wisconsin makes no claim that Glover's guilty plea waived these issues. See Lefkowitz v. Newsome, 420 U.S. 283 (1975); Tollett v. Henderson, 411 U.S. 258 (1973)
 
 
 [3]
 Only three of these claims have been raised on appeal
 
 
 [4]
 Notably, at Glover's request, we appointed counsel and permitted the parties to re-brief the case. The Stone v. Powell issue was raised in the state's original appellate brief, but still ignored by Glover in his new, subsequently filed opening brief
 
 
 [5]
 According to the police reports appended to his petition by Glover, the police immediately obtained the cloth which people living near the bridge had removed from the child's bound hands. The reports also recite that the child was soaking wet when the police first saw her
 
 
 [6]
 Glover was initially charged in two different counties in Wisconsin, and thus two different trial courts heard the defense motions to suppress
 
 
 [7]
 The Wisconsin Court of Appeals held, the one-day delay for further investigation and the filing of a complaint was properly granted by the trial court, and did not constitute an unreasonable delay under Wisconsin law, citing Wis. Stat. §§ 970.01, 970.02
 
 
 [8]
 Glover's counsel notes in the reply brief that despite Circuit Rule 28(f), "Glover has forcefully demanded that counsel address the jurisdictional issue in this reply brief," Appellant's Reply Br. at 5; that he filed the opening brief before Glover had the opportunity to review it; and that this court subsequently denied Glover's attempt to file a supplemental pro se brief raising the issue